963 F.2d 567
 60 USLW 2746
 CARTERET SAVINGS BANK, FA
v.
OFFICE OF THRIFT SUPERVISION, in its own capacity and as
successor in interest to Federal Home Loan Bank Board; T.
Timothy Ryan, Jr., individually and in his official capacity
as Director, Office of Thrift Supervision; Federal Deposit
Insurance Corporation, in its own capacity and as successor
in interest to Federal Savings and Loan Insurance Corporation
Office of Thrift Supervision, and its Director, T. Timothy
Ryan, Jr., Appellants.
 Nos. 91-5597, 91-5290.
 United States Court of Appeals,
Third Circuit.
 Argued Dec. 13, 1991.
Decided May 7, 1992.
 
 Kenneth W. Starr (Argued), Sol. Gen., Stuart M. Gerson, Asst. Atty. Gen., Michael Chertoff, U.S. Atty., U.S. Dept. of Justice, Washington, D.C., Harris Weinstein, Chief Counsel, Thomas J. Segal, Deputy Chief Counsel, Aaron B. Kahn, Asst. Chief Counsel, Jory M. Hochberg, Sr. Trial Atty., Office of Thrift Supervision, Washington, D.C., for appellants, Office of Thrift Supervision, and its Director, T. Timothy Ryan, Jr.
 Douglas Letter, Jennifer Zacks, U.S. Dept. of Justice, Washington, D.C., for appellants-amicus curiae, U.S.
 Frederick B. Lacey (Argued), David S. Turetsky, Stephen H. Orel, Eric Proshansky, Jamie A. Gavrin, Robert E. Plunkett, LeBoeuf, Lamb, Leiby & MacRae, Newark, N.J., John J. Gibbons, Carlton E. Wessel, Crummy, Del Deo, Dolan, Griffinger & Vecchione, Newark, N.J., for appellee, Carteret Sav. Bank, FA.
 Charles J. Cooper, Michael A. Carvin, Robert J. Cynkar, Vincent J. Colatriano, Shaw, Pittman, Potts & Trowbridge, Washington, D.C., for appellee-amici curiae, Sec. Sav. Bank, S.L.A., Transohio Savings Bank, Transcapital Financial Corp., American Capital Corp., Citizens Federal Bank, Citizens Sav. Financial Corp., Northeast Sav., F.A., and Coast Federal Bank, F.S.B. in Support of appellee.
 Paul Blankenstein, Jeffrey T. Gilleran, Gibson, Dunn & Crutcher, Washington, D.C., David B. Fawcett, Jr., Dickie, McCamey & Chilcote, Pittsburgh, Pa. (Robert T. Messner, General Counsel, Pittsburgh, Pa., of counsel), for appellee-amicus curiae, Dollar Bank, F.S.B. in support of appellee.
 Before: SLOVITER, Chief Judge, SCIRICA and ROTH, Circuit Judges.
 OPINION OF THE COURT
 SLOVITER, Chief Judge.
 
 
 1
 Before us are consolidated appeals from a preliminary injunction restraining defendant-appellant Office of Thrift Supervision (OTS) from excluding "supervisory goodwill" in calculating the capitalization of plaintiff-appellee Carteret Savings Bank, FA for regulatory purposes under the new standards established by the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA).
 
 I.
 Facts and Procedural History
 
 2
 Carteret is one of the largest savings and loan associations in New Jersey. In 1982, Carteret arranged to acquire First Federal Savings and Loan Association of Delray Beach, Florida (Delray), and Barton Savings and Loan Association of Newark, New Jersey (Barton). Both institutions were federally-insured thrifts, under the supervision of the Federal Home Loan Bank Board (Bank Board) and the Federal Savings and Loan Insurance Corporation (FSLIC).
 
 
 3
 The parties place different interpretations on Carteret's motivation for these acquisitions. The government notes, and Carteret does not dispute, that in 1981 and early 1982, it had suffered losses, as had other thrift institutions that held long-term, low yielding fixed rate mortgages while their cost of funds sharply increased as a result of record inflation. According to the government, Carteret, which was a federally chartered mutual association owned by its depositors, was planning to convert to a federally chartered stock association owned by public stockholders, and Carteret believed that expansion to Florida by acquiring a "sunbelt" institution would make it more attractive to investors. Thus it proposed to acquire Barton to make its bid to acquire Delray more attractive to the regulators whose approval was needed for the Delray acquisition.
 
 
 4
 Carteret, on the other hand, while conceding that it had business reasons for the acquisitions, presents its role in the 1982 transactions as a "rescue" of failing thrifts at the behest of the regulators. For purposes of this appeal and in light of our view of the applicable legal principles, we take no position on the underlying reasons for the acquisitions.
 
 
 5
 It is undisputed that both Barton and Delray had liabilities far in excess of their assets. On September 30, 1982, the date of acquisition, Barton had assets of $126 million and liabilities of $172 million. Delray had assets of $644 million and liabilities of $812 million. FSLIC gave Carteret $11.7 million of financial assistance in connection with its acquisition of Barton but offered no financial assistance with regard to the Delray acquisition. Following the mergers, Carteret converted to a stock association, raising fresh capital through a public offering.
 
 
 6
 Under the purchase method of accounting, an acquiring institution could treat the excess of liabilities over the assets of the institutions it acquired as an intangible asset denominated "supervisory goodwill," and could amortize (i.e., convert from asset to expense) a portion of the supervisory goodwill at the end of each year for the purpose of calculating regulatory capital. Regulatory capital is the amount of capital that the institution is required to maintain in order to fulfill its obligations under the governing statute and regulations. See 12 U.S.C.A. § 1464(t) (West Supp. 1991) (setting out FIRREA's regulatory capital standards); 12 C.F.R. § 563.13 (1989) (setting out regulatory capital requirements prior to enactment of FIRREA). Carteret's use of the purchase method of accounting and supervisory goodwill was consistent with the practice adopted by other institutions and approved by the Bank Board and the FSLIC in connection with mergers between troubled thrifts and more healthy institutions. The existence of supervisory goodwill had no tax consequences because, as Carteret acknowledges, the Department of the Treasury does not permit any tax deduction for goodwill, which is assumed to have an unlimited useful life. See 26 C.F.R. § 1.167(a)-3 (1991).
 
 
 7
 Carteret's intention to amortize supervisory goodwill is clear. In its revised letter bidding for Barton, Carteret stated that it would use the purchase method of accounting under which the "cost in excess of the fair market value of assets acquired (goodwill) is to be amortized to expense over a period of forty (40) years using the straight-line method." App. at 696. In its letter bidding for Delray, Carteret stated that it was "relying on the [Bank Board] to approve [Carteret's use] of the purchase method of accounting" and that it "expect[ed] the [Bank Board] to approve the amortization of any goodwill created by such adjustment for up to a 40-year period." App. at 87-88. Carteret added that if it could not obtain such approval, it would ask FSLIC to pay Carteret the difference in earnings caused by FSLIC's failure to adopt the suggested procedures.
 
 
 8
 Carteret contends that it stressed the importance of the accounting treatment because Barton and Delray had liabilities that exceeded their assets by $214 million, an amount that far exceeded Carteret's own net worth prior to the acquisitions, and Carteret wanted to treat this difference as an intangible asset that would be gradually converted into an expense over forty years.
 
 
 9
 The Bank Board agreed in its Merger Resolution of September 30, 1982 to permit Carteret to employ the purchase method of accounting to the acquisitions. The Merger Resolution further stated that the two mergers were "condition[ed upon the execution of an] Assistance Agreement between Carteret and the FSLIC." App. at 93. The Assistance Agreement bound the parties' successors, and stated in its integration clause that "any resolutions or letters issued contemporaneously" by the regulators would be considered part of the agreement, as long as they did not conflict with the agreement. App. at 806, 808-09.
 
 
 10
 On the same day as the Merger Resolution, the Bank Board sent a forbearance letter to Carteret which contained ten paragraphs listing forbearances that would be granted to Carteret in connection with the mergers. Carteret relies heavily upon paragraph 10 of this letter, which states:
 
 
 11
 Provided that Carteret submits to the ... Bank Board ... certification ... that Carteret has accounted for the assets and liabilities acquired in the Mergers, and the resulting periods for the amortization of goodwill and the accretion of the loan discount, in accordance with generally accepted accounting principles ("GAAP"), as GAAP existed at the time of the Bank Board's approval of the Mergers, such certification shall be considered to be satisfactory evidence that Carteret's use of the purchase method of accounting is in accordance with GAAP, and such use of the purchase method of accounting will be considered to be in accordance with regulatory accounting procedures.
 
 
 12
 Id. at 31.
 
 
 13
 However, the same forbearance letter also stated that the Bank Board and the FSLIC "expressly reserve[d] all of their statutory rights and privileges with respect to Carteret." Id. at 32. Carteret's counsel sought clarification of this provision by telephone. The Bank Board responded in a letter dated October 12, 1982 that the reservation clause "may be understood as if it read as follows[:]Other than actions to enforce the regulatory requirements waived in accordance with paragraphs 1 through 10 and the statutory provisions authorizing imposition of the waived requirements, insofar as such requirements are waived, the Bank Board and the FSLIC expressly reserve all of their statutory rights and privileges with respect to Carteret...."
 
 
 14
 Id. at 34.
 
 
 15
 Carteret acquired three more troubled thrifts on June 6, 1986, in a single supervisory merger. Two of these acquisitions generated supervisory goodwill: (1) First Federal Savings and Loan Association of Montgomery County, Blacksburg, Virginia (First Federal), and (2) Mountain Security Savings Bank, Wytheville, Virginia (Mountain Security). The supervisory goodwill generated in the 1986 transactions was approximately $22 million (about $20 million in connection with Mountain Security and nearly $2 million in connection with First Federal).
 
 
 16
 As with the 1982 transaction, Carteret contends that it would not have gone forward with the 1986 mergers had it known that it would not have been able to use the supervisory goodwill generated by the 1986 acquisitions as regulatory capital. Carteret's initial bid proposal requested that "[f]or purposes of reporting to the [Bank Board] ... the value assigned to any intangible assets shall be amortized by the straight line method over a period no longer than 25 years." Id. at 745. However, in its subsequent letter requesting forbearances in connection with the 1986 acquisitions, Carteret specifically stated that "no accounting forbearances are requested." Id. at 103. Instead, it merely stated that it intended to use the purchase method of accounting, and requested the Bank Board to acknowledge that this accounting treatment would be "acceptable." Id.
 
 
 17
 By 1986, the allowable period of amortization had been reduced and Carteret consequently asked for an amortization period of only 25 years in connection with the 1986 acquisitions. It also began amortizing the goodwill generated by the 1982 mergers over the shorter 25 year period.
 
 
 18
 In August 1989, Congress enacted the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA), Pub.L. No. 101-73, 1989 U.S.C.C.A.N. (103 Stat.) 183 (codified in scattered sections of 12 U.S.C.). FIRREA abolished both the Bank Board and the FSLIC, and established the Office of Thrift Supervision, which acquired many of the functions previously performed by the Bank Board. See 12 U.S.C.A. §§ 1462a, 1464.
 
 
 19
 FIRREA also effected important substantive changes in the regulation of federally chartered and insured savings and loan institutions. Of particular importance here is the provision that phases out the amount of supervisory goodwill that can be used towards meeting capital requirements. See id. at § 1464(t)(3)(A). OTS stated in Thrift Bulletin 38-2 (Jan. 9, 1990) that even those thrifts that had previously obtained capital and accounting forbearances pursuant to supervisory mergers were bound by the new capital requirements. See App. at 265.
 
 
 20
 In June and December 1990, OTS prepared an examination report of Carteret that did not count all of Carteret's supervisory goodwill as regulatory capital, and consequently Carteret did not meet the risk-based capital requirement mandated by FIRREA. On February 4, 1991, OTS Assistant Director Joseph Kehoe sent Carteret a "Stipulation and Consent to the Issuance of a Capital Directive," with instructions to adopt it by February 28, 1991.
 
 
 21
 In order to forestall OTS from issuing Capital Directives, Carteret initiated this action seeking injunctive and declaratory relief. Carteret sought declarations that: (1) it had entered into binding contracts with the banking regulatory agencies predating the establishment of OTS to use supervisory goodwill towards its capital requirements; (2) the subsequent enactment of FIRREA did not abrogate these contracts nor authorize OTS to do so; (3) OTS's interpretation of FIRREA as abrogating contracts to include supervisory goodwill towards capital compliance was in excess of its statutory authority under FIRREA and was "arbitrary and capricious" within the meaning of the Administrative Procedure Act; (4) OTS is equitably estopped from precluding Carteret from using supervisory goodwill towards its capital requirements; and (5) FIRREA and the OTS capital regulations constitute a taking of Carteret's property without just compensation in violation of the Fifth Amendment. Carteret also sought injunctive relief precluding OTS from imposing any restrictions against it that are inconsistent with its putative contracts to include supervisory goodwill as capital.
 
 
 22
 The district court determined that it had jurisdiction pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 702, 706, and 12 U.S.C.A. § 1464(d)(1)(A), which provides that the Director of OTS is subject to suit, other than suits on claims for money damages.
 
 
 23
 After a hearing on Carteret's motion for a preliminary injunction, the district court held that Carteret had a reasonable probability of success on the merits on two of its claims: (1) that FIRREA did not abrogate the purported agreements to treat supervisory goodwill as regulatory capital, and (2) that OTS's interpretation of FIRREA constitutes a taking of Carteret's property without just compensation in violation of the Fifth Amendment. The court also found that Carteret would suffer irreparable injury without a preliminary injunction because it would be significantly limited in its daily business decisions and would suffer harm to its reputation. See Carteret Savings Bank FA v. Office of Thrift Supervision, 762 F.Supp. 1159 (D.N.J.1991).
 
 
 24
 Accordingly, on April 12, 1991, the district court issued a preliminary injunction that prevents OTS from "taking any action against plaintiff, either directly or indirectly, by reason of defendants' failure to count as capital the total amount of supervisory goodwill recorded by plaintiff (amortized in accordance with plaintiff's agreements with defendants) for all supervisory and regulatory capital determinations and purposes...." App. at 270, 294-95.
 
 
 25
 On May 17, 1991, the district court calculated the amount of supervisory goodwill Carteret possessed. In that connection, it ruled that about $50 million of supervisory goodwill associated with bank branches Carteret subsequently sold would not be included in the injunction. However, the district court granted Carteret's motion for reargument, treating it as a motion for reconsideration, and modified the injunction on July 8, 1991 to include the $50 million of goodwill in connection with the sold branches.
 
 II.
 Jurisdiction and Mootness
 
 26
 In Appeal No. 91-5290, OTS challenges the grant of the preliminary injunction, and in Appeal No. 91-5597, OTS challenges the calculation of the amount of supervisory goodwill that Carteret possessed.[1] This court has appellate jurisdiction over both appeals pursuant to 28 U.S.C. § 1292(a)(1).
 
 
 27
 At the time of the district court's decisions, Carteret would have met all capital requirements had it been able to count its supervisory goodwill as capital. See Carteret, 762 F.Supp. at 1165. However, on August 15, 1991, counsel for Carteret informed this court that even if it were permitted to count all of the supervisory goodwill contained in the preliminary injunction as regulatory capital, it would no longer be in capital compliance under FIRREA. On September 30, 1991, Carteret submitted to OTS a Capital Plan purporting to show how Carteret intends to achieve compliance with regulatory capital requirements. Moreover, Carteret consented to the issuance of a Capital Directive from OTS on October 8, 1991. We therefore asked the parties to file supplemental briefs as to whether the underlying issue was now moot.
 
 
 28
 This court has characterized the constitutional aspects of the mootness requirement as entailing three distinct elements: " '(1) a legal controversy that is real and not hypothetical, (2) a legal controversy that affects an individual in a concrete manner so as to provide the factual predicate for reasoned adjudication, and (3) a legal controversy with sufficiently adverse parties so as to sharpen the issues for judicial resolution.' " International Bhd. of Boilermakers v. Kelly, 815 F.2d 912, 915 (3d Cir.1987) (quoting Dow Chemical Co. v. USEPA, 605 F.2d 673, 678 (3d Cir.1979)). The presence of the third requirement is apparent; we consider the first two.
 
 
 29
 Although OTS argues that Carteret's subsequent submission of a Capital Plan and the issuance of a Capital Directive, to which Carteret consented, signify that there is no longer any basis for the irreparable injury finding on which the preliminary injunction was predicated, OTS also argues that neither the appeals before us nor the underlying case are moot.
 
 
 30
 OTS believes that there is still a case or controversy as to the appropriate calculation of Carteret's regulatory capital both because the applicable law limits the amount of loans that a savings association can make to one borrower relative to a savings association's unimpaired capital, see 12 U.S.C.A. § 1464(u), and relates the volume of transactions that an institution may enter into with its affiliates and subsidiaries to the amount of regulatory capital. See id. at § 1468; 56 Fed.Reg. 34,005, 34,008 (1991) (to be codified at 12 C.F.R. § 563). Arguably, these issues are merely speculative unless there is a more realistic probability than appears on the record that Carteret is likely to seek to lend a greater amount to a single borrower than OTS believes is authorized by FIRREA or that Carteret is likely to seek to engage in a higher volume of covered transactions than would otherwise be permissible.
 
 
 31
 On the other hand, Carteret posits different and more persuasive reasons why the case is not moot. First, Carteret contends that the change in circumstances actually heightens its need for the injunction because it must now achieve capital compliance and that its ability to treat supervisory goodwill as regulatory capital would enable it to achieve compliance more quickly. Carteret's submitted capital plan includes the prediction of an infusion of $150 million of capital from an outside source, and its ability to attract investors will likely vary with the amount of money needed to achieve capital compliance.
 
 
 32
 We agree that neither the case nor the appeals are moot. Carteret is still obtaining a benefit from the preliminary injunction, which restrains OTS from taking any action against Carteret by reason of OTS's failure to count supervisory goodwill "for all supervisory and regulatory capital determinations and purposes." App. at 270. The "central question" in mootness analysis is whether the district court can still provide "meaningful relief" to Carteret. See Huber v. Casablanca Indus., Inc., 916 F.2d 85, 107 (3d Cir.1990), petition for cert. filed, 59 U.S.L.W. 3503 (U.S. Jan. 9, 1991) (No. 90-1092). We are satisfied that it can, and that we need not dismiss for mootness.
 
 III.
 Discussion
 
 33
 The district court's decision is premised on its conclusions (1) that Carteret has a contract right to treat supervisory goodwill as regulatory capital, (2) that FIRREA did not abrogate the contracts between Carteret and the dissolved agencies, and (3) that based on OTS's interpretation of FIRREA as abrogating those contracts, Carteret has a viable claim under the Fifth Amendment that this interference with its investment backed expectations constitutes a taking of property without just compensation that the district court had jurisdiction to enjoin. See Carteret, 762 F.Supp. at 1169-81. We consider these issues in turn.
 
 A. Contracts
 
 34
 In its brief, OTS took the position that we need not reach the issue whether Carteret had any contracts with the government regarding the treatment of goodwill because it was clear that FIRREA overrode any prior action by the Bank Board in this regard. OTS, while reserving its contention that the agreements entered into between the Bank Board and Carteret cannot appropriately be considered to be contracts, has not pressed that as an issue that we must reach for the purpose of the appeal of the preliminary injunction.
 
 
 35
 Thus, we will proceed on the assumption, which is not without support in the record, that the Bank Board, through its forbearance letters to Carteret in connection with the 1982 transaction, agreed to permit Carteret to employ the purchase method of accounting with the concomitant creation of supervisory goodwill, and that this regulatory treatment was a bargained-for prerequisite to the transactions.
 
 
 36
 The language in the documents in the record pertaining to the 1986 transactions makes Carteret's contract claim somewhat more tenuous, but OTS has not pressed any distinction between the 1982 and 1986 transactions for this purpose.[2] Thus, we will assume arguendo that all of the transactions are to be treated as if they embodied contracts that Carteret would have the right to count supervisory goodwill dollar-for-dollar as regulatory capital until fully amortized.
 
 
 37
 We note, however, that nothing in any of the documents pertaining to the mergers explicitly says that the government was waiving its right to effectuate statutory changes with regard to minimum capital requirements. As the Supreme Court has recently stated, sovereign power " 'is an enduring presence that governs all contracts subject to the sovereign's jurisdiction, and will remain intact unless surrendered in unmistakable terms.' " Bowen v. Public Agencies Opposed to Social Security Entrapment, 477 U.S. 41, 52, 106 S.Ct. 2390, 2397, 91 L.Ed.2d 35 (1986) (quoting Merrion v. Jicarilla Apache Tribe, 455 U.S. 130, 148, 102 S.Ct. 894, 907, 71 L.Ed.2d 21 (1982) (emphasis added)); see also Western Fuels-Utah, Inc. v. Lujan, 895 F.2d 780, 789 (D.C.Cir.) (leases granting right to mine coal on federal lands construed as reserving to Congress power to readjust leases, because provisions in lease "susceptible" to such interpretation), cert. denied, --- U.S. ----, 111 S.Ct. 48, 112 L.Ed.2d 24 (1990). As Carteret noted in oral argument, its contention is not that its putative contracts are immune from subsequent legislative changes but rather that FIRREA did not abrogate them. We turn then to the effect of FIRREA on these putative contracts.
 
 B. The Effect of FIRREA
 
 38
 The district court held that FIRREA was ambiguous as to whether it preserved contracts like those the district court found existed here, that the intent of Congress was also ambiguous, and that OTS's interpretation of FIRREA as abrogating contracts permitting use of supervisory goodwill for regulatory purposes was unreasonable.
 
 
 39
 Although we must look first to the statutory language, we review the statute in the light of the atmosphere in which it was enacted. In 1989, the thrift industry was in crisis. As the House Report noted, "[t]he nation's thrift industry and its deposit insurance fund, the [FSLIC] are currently in precarious financial condition and consumer confidence in the savings and loan industry is waning." H.R.Rep. No. 54, 101st Cong., 1st Sess., pt. 1, at 302 (1989), reprinted in 1989 U.S.C.C.A.N. 86, 98. The 2,949 FSLIC-insured savings institutions holding deposits of $971 billion and assets of $1.35 trillion lost $12.1 billion in 1988. Id. at 303, reprinted in 1989 U.S.C.C.A.N. at 99. The FSLIC was in a combined deficit position of at least $56 billion by the end of 1988. Id. at 304, reprinted in 1989 U.S.C.C.A.N. at 100. Rapidly declining consumer confidence led to record deposit withdrawals by consumers. Id. at 305, reprinted in 1989 U.S.C.C.A.N. at 101. Congress believed that the Bank Board, inter alia, had repeatedly understated the magnitude of the problem. Id.
 
 
 40
 The House Report identified a number of causes: "poorly timed deregulation; the dismal performance of some thrift managements; inadequate oversight, supervision and regulation by government regulatory agencies and the Reagan Administration; a regional economic collapse; radical deregulation by several large States; and outright fraud and insider abuse." Id. at 294, reprinted in 1989 U.S.C.C.A.N. at 90.
 
 
 41
 Many members of Congress believed that the thrift crisis was actually exacerbated by "accounting gimmickry," id. at 310-11, reprinted in 1989 U.S.C.C.A.N. at 106-07, such as the treatment of supervisory goodwill as capital, inasmuch as the investors in institutions holding a large amount of intangible assets such as supervisory goodwill had less of their own real assets at stake than would otherwise have been the case.
 
 
 42
 The House Report explained that the primary purposes of FIRREA are to
 
 
 43
 provide affordable housing mortgage finance and housing opportunities for low- and moderate-income individuals through enhanced management of federal housing credit programs and resources; establish organizations and procedures to obtain and administer the necessary funding to resolve failed thrift cases and to dispose of the assets of these institutions; establish a distinction between the regulatory and insurance functions of the thrift industry by (1) ensuring a well capitalized and independent thrift insurance fund, (2) enhancing thrift industry regulation by providing for stronger supervisory oversight of the industry under the Department of Treasury; establish stronger capital standards for thrifts; and, enhance the regulatory enforcement powers of the depository institution regulatory agencies to protect against fraud, waste and insider abuse.
 
 
 44
 H.R.Rep. No. 54, at 307-08, reprinted in 1989 U.S.C.C.A.N. at 103-04.
 
 
 45
 As part of the overhaul of the regulatory structure over savings associations, the FSLIC and the Bank Board were abolished and were replaced by OTS. See Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.L. No. 101-73, Title IV, § 401(a), 1989 U.S.C.C.A.N. (103 Stat.) 183, 354-55 (Aug. 9, 1989). The statute made important substantive changes, of particular importance here the establishment of a new regime of generally applicable regulatory capital requirements designed to improve the health of the industry. The House Conference Report described the importance of the strengthened capital requirements as follows:
 
 
 46
 [S]trong capital standards are essential to protect the safety of our deposit insurance system. Capital represents the investment made by owners of a savings association in that association. Without sufficient capital, the owners have little incentive to limit the risks taken with depositors' funds. Therefore, an adequate capital requirement will provide the self-restraint necessary to limit risk-taking by Federally insured savings associations.
 
 
 47
 Capital also protects the deposit insurance fund by providing a cushion against losses if the institution's condition deteriorates.
 
 
 48
 H.R.Conf.Rep. No. 222, 101st Cong., 1st Sess. 393, 404 (1989), reprinted in 1989 U.S.C.C.A.N. 432, 443.
 
 
 49
 It is in this legislative context that we view the provisions in the statute designed to shore up the capital base of federal savings associations. The provision of section 301 of the Act codified at 12 U.S.C.A. § 1464(s) establishes minimum capital requirements. By its terms, it applies to all savings institutions. See 12 U.S.C.A. § 1464(s)(1) ("the Director shall require all savings associations to achieve and maintain adequate capital by--(A) establishing minimum levels of capital for savings associations; and (B) using such other methods as the Director determines to be appropriate" (emphasis added)). Subsection (s) also permits the Director to treat the failure of any savings association to maintain capital at or above the minimum levels required as an "unsafe or unsound practice", id. at § 1464(s)(3), which may lead to the appointment of a conservator or receiver, see id. at § 1464(d)(2)(A)(ii), -(iii), -(viii). In addition, subsection (s) authorizes the Director to issue a directive to a savings association that fails to meet the minimum capital requirements, which requires that institution to submit and adhere to a plan for increasing capital. See id. at § 1464(s)(4).
 
 
 50
 The next subsection of FIRREA establishes the capital standards that savings associations must meet. The statute provides that "[t]he Director shall, by regulation, prescribe and maintain uniformly applicable capital standards for savings associations." Id. at § 1464(t)(1) (emphasis added). It further provides that a savings association must meet all the capital standards prescribed under that paragraph, which include the requirement that a savings association must maintain tangible capital in an amount not less than 1.5% of its total assets, see id. at § 1464(t)(2)(B), and core capital in an amount not less than 3% of its total assets, see id. at § 1464(t)(2)(A).
 
 
 51
 Of particular pertinence to the issue before us, the statute substantially changes the permissible treatment of intangible assets, such as supervisory goodwill, and, inter alia, specifically excludes the use of supervisory goodwill in the calculation of tangible capital. See id. at § 1464(t)(9)(C).[3] The statute also provides that the amount of "qualifying supervisory goodwill" which may be used in meeting the core capital requirement is limited to a diminishing percentage of the institution's assets, as set forth in the table in id. at § 1464(t)(3)(A), until January 1, 1995, when supervisory goodwill will not count at all.
 
 
 52
 Evidence that Congress intended that its new standards for the use of supervisory goodwill were to apply to savings institutions that had previously relied on such goodwill appears in the definition of "qualifying supervisory goodwill," which is defined as supervisory goodwill existing on April 12, 1989 amortized on a straight line basis over the shorter of 20 years or "the remaining period for amortization in effect on April 12, 1989." Id. at § 1464(t)(9)(B). There would have been no reason to refer to the "remaining period for amortization in effect" if the new provisions were inapplicable to previously acceptable supervisory goodwill.
 
 
 53
 The crux of OTS's statutory language argument is that the provisions of FIRREA sharply curtailing the use of supervisory goodwill toward meeting capital requirements, when read in conjunction with the sections that purport to establish uniformly applicable regulation, demonstrate that FIRREA was designed to abrogate any pre-existing agreements between the former regulators and savings institutions authorizing greater use of supervisory goodwill as regulatory capital. The statutory language referred to above does lend considerable support for OTS's interpretation, but this conclusion is reached through inference, and we cannot agree with OTS that the statutory language alone is dispositive.
 
 
 54
 Carteret also makes a statutory language argument for its contrary position that FIRREA's new capital requirements do not apply when there were arrangements such as it had with the regulatory agencies. It relies primarily on the "savings clause" contained in section 401(g) of the statute, which reads:
 
 
 55
 (g) Savings Provisions Relating to FHLBB--
 
 
 56
 (1) Existing Rights, Duties, And Obligations Not Affected--Subsection (a) [which abolishes the FHLBB and FSLIC] shall not affect the validity of any right, duty, or obligation of the United States, the Federal Home Loan Bank Board, or any other person, which--
 
 
 57
 (A) arises under or pursuant to the Federal Home Loan Bank Act, the Home Owners' Loan Act of 1933, or any other provision of law applicable with respect to such Board (other than title IV of the National Housing Act); and
 
 
 58
 (B) existed on the day before the date of the enactment of this Act.
 
 
 59
 Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.L. No. 101-73, Title IV, § 401(g), 1989 U.S.C.C.A.N. (103 Stat.) 183, 356-57 (Aug. 9, 1989). There is a comparable provision with respect to the FSLIC. See id. § 401(f), 103 Stat. at 356.
 
 
 60
 Carteret argues that not only does FIRREA lack express language of abrogation but that section 401 provides express language of preservation, and that "Carteret's bargained-for contract rights to include supervisory goodwill in regulatory capital (and [the Bank Board's] corollary obligations) fit squarely within 'any' right or obligation arising under the Federal Home Loan Bank Act." Brief of Appellee at 32. It supports its argument with the statutory construction principle that savings clauses are to be broadly construed.
 
 
 61
 Several district court decisions have interpreted section 401(g) in the manner suggested by Carteret to protect contracts authorizing the use of goodwill toward capital requirements. See Security Savings & Loan Ass'n v. Director, Office of Thrift Supervision, 761 F.Supp. 1277, 1284 (S.D.Miss.1991) ("Most courts which have confronted the issue ... have held that FIRREA does not abrogate, but rather preserves, in section 401(g), assistance agreements that were formed in supervisory mergers."); Hansen Savings Bank v. Office of Thrift Supervision, 758 F.Supp. 240, 246 (D.N.J.1991) (section 401(g) preserves contractual forbearances of capital standards even though section 301 states that the new capital standards apply to all thrifts); see also Note, Abrogation of Forbearance Agreements: Unauthorized by FIRREA and Unconstitutional, 59 Geo.Wash.L.Rev. 157, 174 (1990).
 
 
 62
 We find unpersuasive the authorities relying on section 401(g). The uncodified section is contained in Title IV of FIRREA entitled "Transfer of Functions, Personnel, and Property." It is followed by a subparagraph that provides generally for the continuation of suits and protects actions brought by or against the Bank Board. See § 401(h), 103 Stat. at 357. Sections 401(f) and (g) are expressly limited to saving only that which "subsection a" might otherwise affect. Subsection a abolishes the prior regulatory agencies, the FSLIC and the Bank Board, and does not make the substantive changes in capital requirements which are at issue here. The new provisions on capital requirements are contained in section 301, not subsection a of section 401. Thus, by its terms, section 401(g) only saves those contracts that would be abolished as a result of the elimination of the Bank Board and the FSLIC.
 
 
 63
 A similar conclusion was reached by the three courts of appeals that have faced this issue. In Guaranty Financial Services, Inc. v. Ryan, 928 F.2d 994, 1003 (11th Cir.1991), the Eleventh Circuit stated that "[t]he language of § 401(g) does not clearly convey a congressional intention to qualify the phase-out of supervisory goodwill or any of the other new capital standards." It thus held that a contract entered into with a savings institution to use supervisory goodwill as regulatory capital was in effect only "for so long as the statutes and regulations governing the area remained as they were when the agreement was signed," id. at 1001, and that therefore this contract was abrogated by FIRREA. The court explained,
 
 
 64
 the injury that [the institution] complains of is not the result of [the elimination of the FHLBB or FSLIC]. If Congress had not included the supervisory goodwill phase-out in FIRREA, [the institution] would have suffered no injury. But if Congress had included the phase-out but not abolished the Bank Board or the FSLIC, [the institution] would be in the same predicament it is in now. This suggests to us that the possible loss of [the institution's] supervisory goodwill forbearance is the result not of the abolition of the agencies, but of the new capital standards, and that a savings provision that says that the abolition of the agencies "shall not affect the validity of any right, duty, or obligation" is inapplicable to [the institution's] situation.
 
 
 65
 Id. at 1003.
 
 
 66
 The Sixth Circuit reached the same conclusion in Franklin Federal Savings Bank v. Director, Office of Thrift Supervision, 927 F.2d 1332 (6th Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 370, 116 L.Ed.2d 322 (1991). There, a financial group acquired a troubled thrift whose liabilities exceeded its assets by $9.6 million. Franklin asserted that, notwithstanding the provisions in FIRREA, it could amortize its supervisory goodwill in accordance with the forbearance agreement. The court assumed arguendo a contract right for the restructured bank to employ and amortize its supervisory goodwill, but rejected the bank's argument that section 401(g) saved this contract. The court, reasoning from the plain language of section 401 as well as its statutory framework, concluded that "[i]n essence, [section 401(g) ] is intended to assure that the OTS remained in privity with the FSLIC and the FHLBB, not to exempt banks with forbearance agreements from the substantive provisions of FIRREA." Id. at 1339. Accord Century Federal Savings Bank v. United States, 745 F.Supp. 1363, 1368-69 (N.D.Ill.1990) (rejecting argument that section 401(g) saved purported agreement to include goodwill as capital and amortize it over 35-year period).
 
 
 67
 A recent decision of the Ninth Circuit adds further support to our conclusion that FIRREA supersedes prior agreements inconsistent with its terms. In Far West Federal Bank, S.B. v. Director, Office of Thrift Supervision, 951 F.2d 1093 (9th Cir.1991), the Bank Board issued a forbearance letter to investors who infused new capital in a financially troubled savings institution that established a less stringent capital requirement than would otherwise have been required, and provided the institution with financial assistance in the form of a revolving line of credit, which the Bank Board agreed to treat as an "intangible asset" that would be amortized over 25 years and that would count toward capital requirements. After FIRREA was enacted, OTS promulgated regulations that prevented banks from counting lines of credit towards achieving capital compliance and imposed other restrictions inconsistent with the agreement previously reached with Far West. Id. at 1095; see 54 Fed.Reg. 46,845 (1989).
 
 
 68
 The court of appeals vacated the injunction granted to Far West by the district court. The court concluded, as did the other two courts of appeals, that the language, structure, and purpose of FIRREA all supported the interpretation that FIRREA abrogated prior agreements authorizing less demanding capital requirements. In rejecting Far West's contention that its agreement was saved by section 401(g), the court noted that FIRREA contains a provision that explicitly saves certain forbearances, see section 302, 103 Stat. at 344 (noted at 12 U.S.C.A. § 1467a note),[4] but that Far West's forbearance was not saved thereby. The court agreed with the other circuits that the legislative history and structure of FIRREA indicate that "section 401(g) was intended only to preserve contracts that might otherwise lapse automatically through abolition of the Bank Board and transfer of its functions to [OTS], not to exempt ... thrifts from new substantive requirements of FIRREA." Far West, 951 F.2d at 1098.
 
 
 69
 We conclude that the statutory language itself lends great support to OTS's position and that the section cited by Carteret does not indicate that Congress intended in FIRREA to preserve prior agreements to treat supervisory goodwill as regulatory capital. However, because the statutory language relied on by OTS is not conclusive, we will turn to the legislative history to determine whether it sheds light on the congressional intent.
 
 
 70
 The Sixth and Eleventh Circuits have held that the legislative history of FIRREA does clearly indicate that Congress intended to abrogate prior agreements to treat supervisory goodwill as capital. See Guaranty Financial, 928 F.2d at 1004-06; Franklin Federal, 927 F.2d at 1339-41; accord Far West, 951 F.2d at 1098.
 
 
 71
 The district court, noting that the cases are on both sides with respect to whether the legislative history is clear on the question, decided without additional analysis that the intent of Congress is ambiguous, and that in any event a stronger indication of congressional intent is required before a court may infer that Congress intended to abolish contracts entered into by the federal government. Carteret, 762 F.Supp. at 1176. We believe that a review of the legislative history leads to a contrary conclusion. The principal legislative history is found in the House Report, the House Conference Report, and the various debates on both floors with respect to the proposed legislation.
 
 
 72
 The House Report accompanying the bill shows a strong congressional purpose towards avoiding the use of intangible assets like supervisory goodwill as capital. The Report states:
 
 
 73
 To a considerable extent, the size of the thrift crisis resulted from the utilization of capital gimmicks that masked the inadequate capitalization of thrifts. It is the shared belief of the Committee and the Administration that if a crisis of this nature is to be prevented from happening again, thrifts must be adequately capitalized against losses.
 
 
 74
 The legislation seeks to provide this protection by establishing a core capital requirement [that] ... takes effect on June 1, 1990. Beginning then, certain qualifying intangibles can be included on a declining basis until, by January 1, 1995, the [core capital requirement] must be met without any qualifying intangibles.
 
 
 75
 H.R.Rep. No. 54, at 310-11, reprinted in 1989 U.S.C.C.A.N. at 106-07 (emphasis added). The Report thus shows a clear congressional intent to remedy promptly the problem of inadequate capitalization of thrifts caused by the use of intangible assets (such as supervisory goodwill) as regulatory capital. Were thrifts permitted to continue to operate with inadequate tangible assets, the potential for continued massive failures would be ever present.
 
 
 76
 It is significant that three Committee members dissented from the provisions of the proposed legislation that would phase out the use of supervisory goodwill because they believed that the statute would have the effect of abrogating capital forbearance agreements. They wrote:
 
 
 77
 Unfortunately, [the bill] was amended by the Full Committee to phase out the treatment of goodwill for capital purposes over a five year period. Simply put, the Committee has reneged on the agreements that the government entered into concerning supervisory goodwill.
 
 
 78
 ... Clearly, the agreements concerning the treatment of goodwill were part of what the institutions had bargained for. Just as clearly, the Committee is abrogating those agreements.
 
 
 79
 Id. at 498, reprinted in 1989 U.S.C.C.A.N. at 293-94 (additional views of Reps. Annunzio, Kanjorski, and Flake).
 
 
 80
 If the House Committee members, those most intimately familiar with the proposed statute, did not believe that FIRREA would abrogate the earlier capital forbearance agreements, there would have been no need for a dissent grounded on precisely that basis.
 
 
 81
 Even more compelling support for OTS's interpretation of FIRREA is provided by the debate surrounding Congress's rejection of an amendment that would have limited the extent to which capital forbearance agreements were altered by FIRREA. Initially, Representative Quillen proposed "an amendment that grandfathers in all of these savings and loan institutions that had [capital forbearance] agreements." 135 Cong.Rec. H2701 (daily ed. June 15, 1989). When Representative Hyde proposed a more complex amendment on the same issue, Representative Quillen withdrew his amendment, stating that it would be "unfair to the House" to debate both his amendment and that offered by Rep. Hyde. Id.
 
 
 82
 The Hyde Amendment would have provided that a savings institution that failed to meet the new capital requirements solely due to the exclusion of supervisory goodwill from capital had the right to an administrative hearing and judicial review before banking regulators could take adverse actions against the institution. See id. at H2703.
 
 
 83
 Representative Hyde's position is reflected in his statement appended to the House Report, where he stated:
 
 
 84
 [Thrifts] were told that they would be able to carry this goodwill on their books for substantial periods of time. The savings and loans that entered into these arrangements have documentary evidence that they were encouraged by the federal banking regulatory agencies to enter into these transactions. The courts might well construe these agreements as formal contracts.
 
 
 85
 Now, some six or seven years later, Congress is telling these same thrifts that they cannot count this goodwill toward meeting the new capital standards.
 
 
 86
 H.R.Rep. No. 54, pt. V, at 27, reprinted in 1989 U.S.C.C.A.N. at 410 (emphasis added).
 
 
 87
 Admittedly, the Hyde Amendment did not squarely present the issue of Congress's intent to abrogate forbearance agreements, but the debates on the amendment clearly demonstrate that Congress understood that FIRREA would abrogate agreements to use supervisory goodwill as regulatory capital. Representative Hyde stated that his amendment was designed to "remedy" what in his view was the unfairness of "victimiz[ing]" financial institutions whose "only sin ... was trusting the bank regulators and accepting their word that they could count ... supervisory goodwill, for up to 40 years, and in reliance on the word of their Government they merged and they tried to make viable and profitable and solvent the sick institutions." 135 Cong.Rec. H2703-04 (daily ed. June 15, 1989). The Hyde Amendment was fully debated and was soundly defeated. See 135 Cong.Rec. H2703-18 (daily ed. June 15, 1989) (Hyde Amendment rejected by vote of 326-94).
 
 
 88
 The comments made by both the opponents and supporters of the amendment reflected the understanding that FIRREA would alter supervisory goodwill agreements. Compare, e.g., id. at H2710 (Rep. Price stated, "[t]he proponents of this amendment say a 'Deal is a Deal' and wear buttons proclaiming this sentiment. But to claim that Congress can never change a regulator's decision ... in the future is simply not tenable") with id. at H2706 (Rep. Annunzio stated that "[i]t is ironic that Congress ... wants to undo the supervisory goodwill approvals. It makes no sense to me that Congress would ... overturn those agreements in which others volunteered to take the losses. Yet that is what [the bill] does."). Other statements made during the debate also demonstrate Congress's understanding that the statute would abrogate the prior agreements. See generally Guaranty Financial, 928 F.2d at 1006.
 
 
 89
 In contrast, Carteret has not pointed to any legislative history, nor have we located any, that suggests that anyone in Congress understood section 401(g), the purported savings clause Carteret relies upon, as salvaging prior agreements that permitted thrifts to use supervisory goodwill as regulatory capital. As the Sixth Circuit noted, "[n]obody expressed the view that FIRREA did not abrogate forbearance agreements regarding supervisory goodwill." Franklin Federal, 927 F.2d at 1341. OTS argues persuasively that had section 401(g) been the magical elixir that would save institutions holding contractual forbearances from the strengthened capital requirements of FIRREA, surely somebody would have indicated this in the course of the debates to assuage the concerns of those legislators who believed that Congress should not undo prior deals permitting greater use of supervisory goodwill.
 
 
 90
 Carteret attempts to rebut this strong showing in the legislative history by reference to section 501(a) of FIRREA (codified at 12 U.S.C.A. § 1441a) and the legislative history pertaining to it. However, Carteret's reliance on this provision is misplaced. Section 501(a) does not concern OTS at all, but rather applies to the Resolution Trust Corporation (RTC), a separate agency established to manage and resolve the cases involving FSLIC-insured institutions placed in conservatorship or receivership between January 1, 1989 and October 1, 1993. See 12 U.S.C.A. § 1441a(b)(3); see generally Michael P. Malloy, Nothing to Fear but FIRREA Itself: Revising and Reshaping the Enforcement Process of Federal Bank Regulation, 50 Ohio St.L.J. 1117, 1138 (1989).
 
 
 91
 As explained by the House Report, section 501 permits the RTC to review and analyze assistance agreements related to insolvent institution cases resolved between January 1, 1988 and August 9, 1989, and "restructure such resolution agreements" only "as permitted by the terms of the agreement." H.R.Rep. No. 54, at 444, reprinted in 1989 U.S.C.C.A.N. at 240.[5] Because RTC's authority with respect to insolvent institutions has little or no bearing on FIRREA's capital standards for thrifts, section 501 does not assist us in determining congressional intent vis-a-vis OTS. See Far West, 951 F.2d at 1099 ("Nothing in section 501, which is not concerned with regulatory changes, undermines" interpretation that FIRREA's capital standards override provisions in pre-FIRREA agreements to the contrary).
 
 
 92
 In light of the absence of any legislative history to support its position, Carteret relies on the principle of statutory interpretation that Congress's abrogation of pre-existing contract rights must be in clear and unmistakable terms, citing e.g., Feres v. United States, 340 U.S. 135, 146, 71 S.Ct. 153, 159, 95 L.Ed. 152 (1950). Without derogating from that principle under usual circumstances, we find it inapplicable here. In the massively regulated banking industry, where the rules of the game change with some regularity, the premise that Congress would not intend to alter agreements such as the one with Carteret is questionable.
 
 
 93
 Moreover, Carteret's asserted contract rights do not emanate from a privately negotiated contract; rather, the government was a party and gave Carteret whatever contract rights it may have. Carteret relies on language in Chester County Intermediate Unit v. Pennsylvania Blue Shield, 896 F.2d 808 (3d Cir.1990), but that case raised a substantially different issue: whether the Education of the Handicapped Act precluded insurance companies from excluding from coverage services provided free of charge under the Act. We carefully limited our holding to private contracts. See id. at 815 ("[W]e cannot conclude, without clear statutory support, that Congress intended the EHA to abrogate such a provision in a privately negotiated contract. We are confident that Congress would not have done so without explicitly so providing.").
 
 
 94
 In this case, the statutory language, when bolstered by the legislative history, securely demonstrates that Congress understood FIRREA as abrogating the type of agreement Carteret had. See also Far West, 951 F.2d at 1099; Guaranty Financial, 928 F.2d at 1006; Franklin Federal, 927 F.2d at 1341. We thus find no support for the district court's statement that "[n]or does any amount of legislative history overcome the requirement that elimination of contractual rights must be done clearly and unequivocally." Carteret, 762 F.Supp. at 1178 (emphasis added).
 
 
 95
 In any event, even if the statute and legislative history were less clear, OTS's interpretation is certainly a reasonable one entitled to deference. The district court agreed with Carteret that OTS's interpretation is not entitled to deference because it was unreasonable. As our foregoing discussion shows, we do not agree.
 
 
 96
 On appeal, Carteret argues that the Supreme Court's recent decision in Gregory v. Ashcroft, --- U.S. ----, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991), supports its argument against deference. However, in Gregory, the Court's holding that the ADEA could not be assumed to apply to Missouri's constitutional provision requiring state judges to retire at age 70 without unmistakably clear language in the statute was based on the inference that Congress did not intend to overturn the balance of federal and state powers. Accordingly, the majority of the Court neither deferred to nor even discussed the EEOC's interpretation that the ADEA would apply. See id. 111 S.Ct. at 2418 (Blackmun, J., dissenting). Gregory is therefore inapposite.
 
 
 97
 Carteret also argues that because OTS, as successor to the Bank Board, is now a party to the agreements, it is entitled to no deference. Essentially, this argument presumes bias or prejudice by OTS, but there is no record basis for such a presumption. OTS's position regarding the impact of FIRREA's capital provisions on forbearance agreements was announced in Thrift Bulletin 38-2 (Jan. 9, 1990), which was promulgated well in advance of this litigation. Carteret has not shown that OTS is merely advancing an expedient interpretation of the statute to serve its purposes in litigation, and OTS is entitled to the usual deference accorded an agency's interpretation of the governing statute.
 
 
 98
 We conclude that in light of the statutory language, including Congress's failure to include any provision expressly saving from revised regulation the type of forbearance agreement entered into with Carteret, and the unambiguous legislative history, FIRREA must be interpreted to supersede Carteret's agreements with the earlier regulatory agencies.
 
 C. Takings
 
 99
 Thus, the only remaining basis on which we could affirm the district court's holding that Carteret had a reasonable likelihood of success on the merits is the district court's conclusion that OTS's interpretation of FIRREA as abrogating Carteret's purported contract right to treat supervisory goodwill as regulatory capital constitutes a taking without just compensation within the meaning of the Fifth Amendment.
 
 
 100
 OTS argues that the district court lacked subject matter jurisdiction over Carteret's claim seeking injunctive relief from an alleged taking of its property because exclusive jurisdiction over that claim lies in the United States Claims Court pursuant to the Tucker Act.[6] The district court held that it had subject matter jurisdiction over Carteret's takings claim because the relief provided by the Tucker Act would be inadequate. Carteret, 762 F.Supp. at 1179-80. The court stated that "[i]t is clear that in cases where compensation under the Tucker Act is unavailable or inadequate, the plaintiff is entitled to equitable relief even in a United States District Court." Id. at 1179.
 
 
 101
 Although we do not disagree with the principle as enunciated by the district court, we conclude that OTS's jurisdictional challenge is meritorious.
 
 
 102
 The Supreme Court has recently reiterated that the Fifth Amendment[7] does not "limit the governmental interference with property rights per se, but rather ... secure[s] compensation in the event of an otherwise proper interference amounting to a taking." First English Evangelical Lutheran Church v. County of Los Angeles, 482 U.S. 304, 315, 107 S.Ct. 2378, 2385-86, 96 L.Ed.2d 250 (1987). The Court has repeatedly held that " '[e]quitable relief is not available to enjoin an alleged taking of private property for a public use, duly authorized by law, when a suit for compensation can be brought against the sovereign subsequent to a taking.' " United States v. Riverside Bayview Homes, Inc., 474 U.S. 121, 127-28, 106 S.Ct. 455, 459, 88 L.Ed.2d 419 (1985) (quoting Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1016, 104 S.Ct. 2862, 2880, 81 L.Ed.2d 815 (1984)).
 
 
 103
 Consistent with these principles, the Court has further held that " '[i]f the government has provided an adequate process for obtaining compensation, and if resort to that process "yield[s] just compensation," then the property owner "has no claim against the Government" for a taking.' ... For this reason, 'taking claims against the Federal Government are premature until the property owner has availed itself of the process provided by the Tucker Act.' " Preseault v. ICC, 494 U.S. 1, 11, 110 S.Ct. 914, 921, 108 L.Ed.2d 1 (1990) (quoting Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City, 473 U.S. 172, 194-95, 105 S.Ct. 3108, 3121, 87 L.Ed.2d 126 (1985) (quoting Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1013, 1018 n. 21, 104 S.Ct. 2862, 2878, 2881 n. 21, 81 L.Ed.2d 815 (1984))).
 
 
 104
 For instance, in Monsanto the Court held that certain public disclosures by the EPA (pursuant to statute) of health, safety, and environmental data, which were cognizable as trade-secret property rights under state law, would have effected a taking under the Fifth Amendment. However, the Court held that the district court erred in enjoining the taking because an adequate remedy for the taking existed in the Claims Court under the Tucker Act. 467 U.S. at 1019, 104 S.Ct. at 2881.
 
 
 105
 Carteret argues that Monsanto and the other cases cited by OTS are distinguishable because there was apparently no issue in them as to whether the relief available under the Tucker Act would rise to the level of "just compensation" required by the Fifth Amendment. Carteret continues that because the alleged taking here means that OTS can issue directives severely interfering with Carteret's ability to acquire new assets and liabilities, it will be impossible to obtain relief under the Tucker Act rising to the constitutionally required level of "just compensation." We find unpersuasive Carteret's contention that monetary relief in this case could not provide just compensation. While damages may be difficult to measure, compensation could certainly be paid for damage to the thrift's business.
 
 
 106
 An argument similar to that made by Carteret has recently been rejected in Northeast Savings, F.A. v. Director, Office of Thrift Supervision, 770 F.Supp. 19, 24-25 (D.D.C.1991). In holding that injunctive relief was unavailable on the thrift's claim that OTS's interpretation of FIRREA constituted a "taking," the court reasoned that the purported contract between the plaintiff and the FSLIC and the Bank Board "is the very source of the rights upon which plaintiff has sued," and "[t]he specific performance of an alleged contract between plaintiff and defendants is unavailable because Congress has determined that damages are the only relief available on such claims." Id. at 23 (citations omitted). We agree with the Northeast Savings court that "a claimant may not avoid the exclusive jurisdiction of the Claims Court simply by framing a complaint to seek non-monetary relief." Id. at 24. It follows that "plaintiff's proper remedy is an action for 'just compensation' in the United States Claims Court." Id.
 
 
 107
 The cases cited by Carteret for the proposition that a taking is properly enjoined when monetary damages would be inadequate are inapposite. Both Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 585, 72 S.Ct. 863, 865-66, 96 L.Ed. 1153 (1951) (the "steel seizure" case), and Ramirez de Arellano v. Weinberger, 745 F.2d 1500, 1522-23 (D.C.Cir.1984) (en banc), vacated on other grounds, 471 U.S. 1113, 105 S.Ct. 2353, 86 L.Ed.2d 255 (1985), involved takings that were effected without statutory authority. When an officer of the United States commits a taking that is not authorized by an Act of Congress, the Claims Court lacks jurisdiction to award relief because the officer's action is deemed not to be an "act of the government" within the meaning of the Tucker Act. See Regional Rail Reorganization Act Cases, 419 U.S. 102, 127 n. 16, 95 S.Ct. 335, 350 n. 16, 42 L.Ed.2d 320 (1974). In those circumstances, the Tucker Act does not apply and, because there is no procedure for obtaining "just compensation", the actions constituting the taking may be properly enjoined. In contrast, in this case OTS is acting pursuant to the congressional authorization provided in FIRREA. See Northeast Savings, 770 F.Supp. at 24 n. 4.
 
 
 108
 Nor does the footnote in Duke Power Co. v. Carolina Envt'l Study Group, Inc., 438 U.S. 59, 71 n. 15, 98 S.Ct. 2620, 2629 n. 15, 57 L.Ed.2d 595 (1978), upon which Carteret relies, support jurisdiction in the district court to issue an injunction. In Duke Power, the Court explained that the district court had subject matter jurisdiction under 28 U.S.C. § 1331 because the plaintiffs were not requesting compensation for a taking, but rather were "requesting a declaratory judgment that since the Price-Anderson Act d[id] not provide [an] assurance of adequate compensation in the event of a [nuclear catastrophe], it [was] unconstitutional." Id. The Duke Power plaintiffs, unlike Carteret, did not seek to enjoin the government from taking actions authorized by statute. Nothing in that opinion suggests that the district court would have power to enjoin such a taking.
 
 
 109
 It follows that because the Tucker Act remedy is available to Carteret, Carteret must seek to vindicate its taking claim in Claims Court. Although monetary compensation may be difficult to ascertain, this is the only relief to which Carteret may be entitled. See Regional Rail Reorganization Act Cases, 419 U.S. at 155-56, 95 S.Ct. at 364-65 (takings resulting in significant losses of business, including the closing down of a business, are not beyond the power of the Claims Court to compensate); Northeast Savings, 770 F.Supp. at 24 (though "monetary damages may ebb and flow," plaintiff's proper remedy is action in Claims Court); see also Far West, 951 F.2d at 1100 (since FIRREA did not withdraw jurisdiction of Claims Court, it is for Claims Court to consider takings issue); Franklin Federal, 927 F.2d at 1341 (in the event that abrogation of contract to treat goodwill as regulatory capital "were determined to be a taking, [the institution] would be entitled to compensation, not to equitable relief").
 
 
 110
 We take no position as to whether Carteret has a viable takings claim, but hold only that neither the district court nor this court provides the appropriate forum to decide that issue.
 
 IV.
 Conclusion
 
 111
 To summarize, we have concluded that the language of FIRREA and its unambiguous legislative history demonstrate that Congress intended FIRREA's new capital requirements that limit the use of supervisory goodwill as regulatory capital to override any agreements that savings associations had to the contrary. In addition, we conclude that the United States Claims Court has exclusive jurisdiction over Carteret's taking claim pursuant to the Tucker Act. Therefore, we hold that as a matter of law Carteret does not have a reasonable probability of success on the merits of its claim seeking a declaration that FIRREA does not supersede its putative contracts to treat supervisory goodwill as regulatory capital. Nor does its claim seeking a declaration that OTS's interpretation of FIRREA as abrogating its putative contracts constitutes a taking provide a basis for the preliminary injunction because the district court lacked jurisdiction over this claim. Because we find that Carteret has not established a reasonable probability of success on the merits, we will vacate the district court's order granting the preliminary injunction dated April 12, 1991 and remand for further proceedings consistent with this opinion.[8]
 
 
 
 [1]
 In the underlying case, Carteret named as defendants OTS, its Director, T. Timothy Ryan, and the Federal Deposit Insurance Corporation (FDIC). OTS and its Director are appellants in both of these appeals. For convenience we will refer to them collectively as "OTS." The FDIC is not a party in either appeal inasmuch as the district court did not include it in the injunctive order from which this appeal lies
 
 
 [2]
 As the district court noted, it is more difficult to evaluate the scope of the 1986 contract, if any, because there apparently is a forbearance letter related to the 1986 acquisitions that was not produced to the district court but is described in bid letters and other documents on the record. See Carteret, 762 F.Supp. at 1173 n. 18
 
 
 [3]
 This is accomplished by defining "tangible capital" as "core capital minus any intangible assets." 12 U.S.C.A. § 1464(t)(9)(C)
 
 
 [4]
 Section 302 provides:
 Notwithstanding the amendment made by this title to section 10 of the Home Owners' Loan Act ... --
 (1) any plan approved by the Federal Home Loan Bank Board under such section 10 ... shall continue in effect as long as such association adheres to the plan and continues to submit to [OTS] regular and complete reports on the association's progress in meeting the savings association's goals under the plan....
 § 302, 103 Stat. at 343. The referenced section applies to capital restoration plans approved by the Bank Board, and is as inapplicable to Carteret as it was to Far West.
 
 
 [5]
 Section 501(b)(11)(B) provides in relevant part that "[t]he [RTC] shall exercise any and all legal rights to modify, renegotiate, or restructure [agreements relating to cases involving insolvent institutions] where savings would be realized by such actions.... Nothing in this paragraph shall be construed as granting the [RTC] any legal rights to modify, renegotiate, or restructure agreements between the [FSLIC] and any other party, which did not exist prior to August 9, 1989." 12 U.S.C.A. § 1441a(b)(11)(B)
 A small group of eight members of the House Committee suggested that section 501 denied RTC the power to restructure such agreements because of the "binding" nature of the agreements and "that the Government has the moral and legal obligation to stand behind every element of these agreements." See H.R.Rep. No. 54, at 535, reprinted in 1989 U.S.C.C.A.N. at 328 (additional views of Reps. Hiler, Ridge, Bartlett, Dreier, McCandless, Saiki, Baker, and Paxon). Although viewed out of context, this might suggest that these Representatives thought the bill later enacted as FIRREA intended to preserve agreements such as Carteret's, with respect to the draft of the provisions at issue here and later incorporated in section 301, these same eight Representatives also expressed their concern about the interruption of "the [amortization of supervisory goodwill] in midstream, leaving the institutions with only a four-year period in which to attract other forms of capital." See id. at 533, reprinted in 1989 U.S.C.C.A.N. at 326. They stated that "[a]s a result, many of these institutions will be labeled unsafe and unsound, be placed under a supervisory arrangement and have their growth controlled." Id. This rather clearly suggests that they understood the bill as altering for regulatory capital purposes negotiated transactions in which institutions had acquired unhealthy thrifts.
 
 
 [6]
 The Tucker Act provides, in relevant part:
 Claims Against United States generally; actions involving Tennessee Valley Authority:
 (a)(1) The United States Claims Court shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.
 28 U.S.C. § 1491 (1988) (emphasis added).
 
 
 [7]
 The Fifth Amendment provides in relevant part that "private property [shall not] be taken for public use, without just compensation."
 
 
 [8]
 Since we will vacate the order granting the preliminary injunction issued by the district court, we will also vacate the court's order, which is the subject of Appeal No. 91-5597, enjoining OTS from excluding supervisory goodwill written down by Carteret pursuant to the sale of certain Delray branches