NORTHEAST SAVINGS, F.A., Plaintiff,

v.

DIRECTOR, OFFICE OF THRIFT SUPERVISION, et al., Defendants.

Civ. A. No. 89–3288 (JHG).

United States District Court, District of Columbia.

July 16, 1991.

Charles J. Cooper, Michael A. Carvin, Robert R. Vieth, McGuire, Woods, Battle & Boothe, Washington, D.C., for plaintiff.

Aaron B. Kahn, Richard Harvey, Attys., Office of Chief Counsel, Office of Thrift Supervision, Washington, D.C., for OTS.

Theodore C. Hirt, Robin Ball, Jerome L. Epstein, Attys., U.S. Dept. of Justice, Civil Div., Washington, D.C., for FDIC.

## MEMORANDUM OPINION

JOYCE HENS GREEN, District Judge.

Plaintiff, Northeast Savings, F.A. ("Northeast") initiated this action, alleging that defendants' repudiation and abrogation of contractual promises to plaintiff constitute a breach of contract, a taking of plaintiff's property without just compensation in violation of the fifth amendment of the Constitution, and a deprivation of plaintiff's property without due process of law in violation of the fifth amendment to the Constitution. Specifically, Northeast asserts that defendants must accord full capital treatment, for purposes of satisfying Northeast's minimum capital regulatory requirements to (a) supervisory goodwill that appears on Northeast's books as a result of Northeast's 1982 acquisitions of three failed savings and loan institutions, and (b) cumulative preferred stock issued by Northeast and held by the Federal Savings & Loan Insurance Corporation ("FSLIC") Resolution Fund that had been exchanged for an Income Capital Certificate ("ICC") issued by Northeast in connection with one of the mergers.

On July 10, 1990, Northeast moved for dismissal without prejudice of the FSLIC preferred stock issues, which motion was granted on July 25, 1990. Defendants have also moved to dismiss the complaint for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted, and plaintiff has moved for summary judgment and filed a motion for a preliminary injunction. For the following reasons, defendants' motion to dismiss is granted, and plaintiff's motions are denied as moot.

## I. BACKGROUND

In the late 1970s and early 1980s, high interest rates and record inflation precipitated a liquidity crisis in the savings and loan ("S & L") industry, and most thrifts experienced large operating losses. Congress, the Federal Home Loan Bank Board ("FHLBB"), and state regulatory authorities responded to this crisis in a number of ways, generally expanding both the scope of permissible thrift investment powers and thrifts' ability to compete with other institutions for funds.

The FSLIC, however, was soon exposed to extensive losses resulting from the fail-

ure of rapid growth thrifts with poorly collateralized loan portfolios, thrifts that had invested their assets in potentially high-risk ventures. As a consequence of these and other factors, FSLIC was faced with hundreds of problem thrifts, and the FSLIC deposit insurance fund was virtually depleted.

In response, Congress enacted the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub.L. No. 101–73, 103 Stat. 183, which provided for the contribution of funds to close insolvent institutions, recapitalized the thrift deposit insurance fund, and modified the regulatory framework within which the industry operates. Specifically, the FIRREA abolished the FSLIC, transferring FSLIC's functions to other agencies; created a new Savings Association Insurance Fund ("SAIF"), under FDIC management, but did not make the FDIC the primary regulator of thrifts; established the FSLIC Resolution Fund, under FDIC management, transferring to it most of FSLIC's assets and liabilities; abolished the FHLBB and established the Office of Thrift Supervision ("OTS") in the Department of the Treasury, making it responsible for examination, supervision, and regulation of all federally insured savings associations and chartering of federal thrifts; established the Resolution Trust Corporation ("RTC"), charged with resolving the cases of thrifts closed between January 1989 and August 1992; and established the Resolution Funding Corporation ("REFCORP") as a vehicle for financing the RTC's activities.

At the same time that the FIRREA provided public financial support for the thrift industry, FIRREA adopted a number of regulatory reforms designed to prevent a recurrence of the thrift crisis. FIRREA adopted a new subsection 5(t)(1) of the Home Owners' Loan Act ("HOLA"), 48 Stat. 128 (codified as amended at 12 U.S.C. §§ 1461 *et seq.*), which provided that the Director of OTS was to promulgate new regulations prescribing capital standards for thrift institutions by November 7, 1989, to become effective by December 7, 1989. The statute required the regulations to set forth three sorts of capital standards: a "leverage" limit, a "tangible capital" requirement, and a risk-based capital requirement.

FIRREA's "leverage limit," and OTS's implementing regulation, require savings associations to maintain "core capital" of not less than three percent of the savings association's assets. Core capital is defined to include certain tangible and intangible components of capital other than goodwill, as well as certain "qualifying supervisory goodwill," which is goodwill that existed on an eligible institution's books on April 12, 1989, amortized over a period of twenty years or less. Similarly, FIRREA's "tangible capital" standard, and OTS's implementing regulation, requires thrifts to maintain tangible capital of not less than 1.5% of the thrift's total assets, and tangible capital is defined as core capital less intangible assets such as goodwill.

In February 1982, the FSLIC, the agency then responsible for insuring deposit accounts at all federally chartered thrifts and some state-chartered institutions, solicited bids from various sources that might be interested in acquiring the Hartford Federal Savings & Loan Association ("Hartford") of Hartford, Connecticut. Schenectady Savings Bank, FSB ("Schenectady") was among the entities that submitted bids to acquire Hartford. Thereafter, the FHLBB, the agency then charged with regulating all federally chartered savings and loans, approved the merger of Schenectady and Hartford and authorized the FSLIC to provide financial assistance to Schenectady.

Schenectady and Hartford entered into an agreement and plan of merger. The FSLIC and Schenectady entered into an Assistance Agreement providing, *inter alia*, that the FSLIC would contribute $12 million to Schenectady after the merger, as well as up to $1.7 million in dividends on certain Federal Home Loan Bank of Boston stock. The merger was consummated on March 12, 1982, and the merged institution was named "Northeast Savings, a Federal Savings and Loan Association."

According to the complaint, the Assistance Agreement incorporated FHLBB's

resolution approving the merger, and the resolution conditionally approved accounting to the merger under the "purchase method" of accounting. In accordance with generally accepted accounting principles ("GAAP"), goodwill arising from the purchase method of accounting for a merger may be amortized over a period of up to 40 years. The complaint further alleges that Schenectady satisfied the conditions specified in the FHLBB resolution, and that Northeast recorded goodwill attributable to the transaction on its books, amortizing it over a 40–year period.

Shortly thereafter, Northeast acquired two other S & Ls: Freedom Federal Savings & Loan Association ("Freedom Federal") of Worcester, Massachusetts, and First Federal Savings & Loan Association ("First Federal") of Boston, Massachusetts. In response to a solicitation for bids, Northeast had submitted to FSLIC on June 10, 1982, a proposal for the acquisition of Freedom Federal. On October 8, 1982, the FHLBB approved the merger and authorized FSLIC to provide Northeast financial assistance in two forms: 1) an FSLIC note in the amount of $50 million, in return for $50 million in Income Capital Certificates ("ICCs")[1] issued by Northeast, and 2) cash in an amount equal to the negative net worth of Freedom Federal as shown in Freedom Federal's most recent monthly report to FSLIC. In addition, Northeast and FSLIC entered into a Master Agreement, which set forth the terms of the ICC transaction. The merger of Northeast and Freedom Federal was consummated on October 8, 1982.

It is not alleged in the complaint that the Master Agreement between FSLIC and Northeast made any provision concerning use of the purchase method of accounting or the inclusion of goodwill in capital. The complaint states that the FHLBB resolution approving the merger provided that "the merger shall be accounted for using the purchase method of accounting in accordance with [GAAP]" but that the resolu-

tion's definition of pertinent GAAP principles "shall apply only for purposes of ... the [ICCs], and the Promissory Note issued by the FSLIC in connection [therewith] ..., and for reports made to the Bank Board and the FSLIC." Complaint, ¶ 64. By a separate letter, the FHLBB stated that Northeast's use of purchase accounting would be deemed in accordance with GAAP and regulatory capital requirements upon receipt of Northeast's independent accountant's opinion. Complaint, ¶ 65. Northeast subsequently provided such an opinion, which specified that goodwill would be amortized over a 30–year period.

Northeast entered into a Merger Agreement with First Federal on July 12, 1982. Complaint, ¶ 68. The FHLBB adopted a resolution approving the merger on October 8, 1982, and Northeast consummated the transaction on that date. Complaint, ¶¶ 49, 69, 70. Unlike the two mergers discussed above, the Northeast/First Federal merger involved no financial assistance from FSLIC.

The FHLBB's resolution approving this transaction stated that "the merger may be accounted for using the purchase method of accounting in accordance with [GAAP]," but that the resolution's definition of pertinent GAAP principles "shall apply only for purposes of ... reports made to the Bank Board and the FSLIC." Complaint, ¶ 69. In a separate letter, FHLBB stated that Northeast's use of purchase accounting would be deemed in accordance with GAAP and regulatory capital requirements upon receipt of Northeast's independent accountant's opinion. Complaint, ¶ 70. Northeast subsequently provided such an opinion, which specified that goodwill would be amortized over a 30–year period. Complaint, ¶ 70.

## II. DISCUSSION

In viewing a motion to dismiss, "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of

---

**1.** ICCs are instruments that require certain payments be made to the holder, FSLIC, based on the issuer's income and capital. When the is- suer reaches a specified level of profitability and capital adequacy, it must redeem the ICCs.

facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957). The factual allegations of the complaint must be presumed true and liberally construed in favor of plaintiff. *Ramirez de Arellano v. Weinberger,* 745 F.2d 1500, 1506 (D.C.Cir.1984); 5A C. Wright & A. Miller, *Federal Practice and Procedure,* § 1357, p. 304 (1990). The plaintiff is entitled to all favorable inferences which may be drawn from those allegations. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974).

As a threshold matter, defendants contend that this Court lacks subject matter jurisdiction over this cause of action and that jurisdiction over plaintiff's claims lies exclusively in the United States Claims Court. Northeast concedes that this action is, in essence, a suit against the federal sovereign under the standards set forth in *Dugan v. Rank,* 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963).[2] The issue, therefore, is whether this Court, or the Claims Court, can entertain Northeast's suit for "injunctive relief" against the United States.

It is indisputable that this District Court would have jurisdiction over a genuine due process claim that is not, at its essence, a claim for breach of contract. However, where the crux of the complaint rests on an alleged contractual violation, plaintiff is limited by the Tucker Act and its mandate to proceed in Claims Court.

As the Court of Appeals suggested the inquiry a court must make in characterizing a claim, "The classification of a particular action as one which is or is not 'at its essence' a contract action depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate)." *Megapulse, Inc. v. Lewis,* 672 F.2d 959, 968

(D.C.Cir.1982). It is clear on the face of the complaint that plaintiff's due process claim seeks to enforce plaintiff's contract. Specifically, the complaint states, "This *repudiation* and *abrogation*[3] of defendants' contractual promises to Northeast constitute a breach of contract, a taking of Northeast's property without just compensation in violation of the Fifth Amendment to the United States Constitution, and a deprivation of Northeast's property without due process of law in violation of the Fifth Amendment to the United States Constitution." Complaint, ¶ 1 (emphasis added). The purported contract between plaintiff and the FSLIC and FHLBB is the very source of the rights upon which plaintiff has sued.

Moreover, it is equally clear that the relief plaintiff seeks is not "appropriate" here. The specific performance of an alleged contract between plaintiff and defendants is unavailable because Congress has determined that damages are the only relief available on such claims. *See* 1976 H.R.Rep. No. 1656, 94th Cong., 2d Sess. 12–13 (1976), U.S.Code Cong & Admin.News, pp. 6121, 6132–33. As the Court of Appeals for this Circuit has explained, "[A]n action against the United States which is at its essence a contract claim lies within the Tucker Act[,] and ... a district court has no power to grant injunctive relief in such a case." *Megapulse,* 672 F.2d at 967. This is so even where the plaintiff does not specifically request monetary relief. As then-Judge Scalia noted, "The sole remedy for an alleged breach of contract by the federal government is a claim for money damages ... in the United States Claims Court under the Tucker Act, 28 U.S.C. § 1491(a)(1) (1982).... We know of no case in which a court has asserted jurisdiction either to grant a declaration that the United States was in breach of its contractual obligations or to issue an in-

**2.** As the Supreme Court explained the test in *Dugan,* "The general rule is that a suit is against the sovereign if 'the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration,' ... or if the effect of the judgment would be 'to restrain the Government from acting, or to com-

pel it to act.'" *Id.* 372 U.S. at 620, 83 S.Ct. at 1006 (citations omitted).

**3.** In Webster's New World Dictionary, repudiate is defined "to refuse to acknowledge or pay," and abrogate is defined "to repeal, abolish, annul, cancel."

**24**

junction compelling the United States to fulfill its obligations." *Sharp v. Weinberger*, 798 F.2d 1521, 1523–24 (D.C.Cir. 1986). Thus, a claimant may not avoid the exclusive jurisdiction of the Claims Court simply by framing a complaint to seek nonmonetary relief. *See Ingersoll–Rand Co. v. United States*, 780 F.2d 74, 79 (D.C.Cir. 1985). As the legislative history makes clear, "[I]n the Court of Claims Act, Congress created a damage remedy for contract claims with jurisdiction limited to the Court of Claims except in suits for less that $10,000. The measure is intended to foreclose specific performance of government contracts." 1976 H.R.Rep. No. 1656, 94th Cong., 2d Sess. 12–13 (1976), U.S.Code Cong. & Admin.News, pp. 6121, 6132–33.

In any event, the injunctive relief requested in this case—regulatory treatment of goodwill—cannot be granted because it is contrary to federal law. Plaintiff seeks, in essence, an order permitting plaintiff, and requiring defendants, to violate statutory and regulatory requirements. And even if plaintiff's claims prove to be meritorious, a court may not, based upon a contract, issue an injunction that orders a violation of the law. *See, e.g., Texas Co. v. Z & M Independent Oil Co.*, 66 F.Supp. 957, 963 (N.D.N.Y.1945), *aff'd*, 156 F.2d 862 (2d Cir.1946).

Injunctive relief is also unavailable on plaintiff's claim that the provisions of FIRREA and the OTS capital regulation restricting the inclusion of supervisory goodwill effect a taking. Although plaintiff contends that the relationship between plaintiff and defendant and the factors that impact on that relationship are fluid; that monetary damages may ebb and flow and thus, are difficult to discern; and that plaintiff would be forced to pursue a series

of damages suits if the Court did not grant the requested relief; plaintiff's proper remedy is an action for "just compensation" in the United States Claims Court. "The Fifth Amendment does not proscribe the taking of property; it proscribes taking without just compensation." *Williamson County Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 194, 105 S.Ct. 3108, 3120, 87 L.Ed.2d 126 (1985). Accordingly, the Supreme Court has repeatedly held that " '[e]quitable relief is not available to enjoin an alleged taking of private property for a public use, duly authorized by law, when a suit for compensation can be brought against the sovereign subsequent to a taking.' " *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 127–28, 106 S.Ct. 455, 459–60, 88 L.Ed.2d 419 (1985) (quoting *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1016, 104 S.Ct. 2862, 2879, 81 L.Ed.2d 815 (1984)). In fact, the Supreme Court has recently made clear that, as a substantive matter, there has been no taking without just compensation unless a plaintiff has presented a claim for compensation in Claims Court and that takings claims presented to a district court before the Claims Court remedy has been invoked is premature. " 'If the government has provided an adequate process for obtaining compensation, and if resort to that process "yield[s] just compensation," then the property owner "has no claim against the Government" for a taking'.... For this reason, 'taking claims against the Federal Government are premature until the property owner has availed itself of the process provided by the Tucker Act.' " *Preseault v. I.C.C.*, 494 U.S. 1, 110 S.Ct. 914, 921, 108 L.Ed.2d 1 (1990) (citations omitted).[4]

---

**4.** In Plaintiff's Supplemental Memorandum in Opposition to Motion to Dismiss, plaintiff contends that *Preseault* made clear that injunctive relief is appropriate for a taking claim if the alternative of a Claims Court remedy is not adequate to compensate plaintiff. While it is true that the Claims Court does not have jurisdiction to award relief for 'unauthorized takings' because such actions are not the actions of the United States, FIRREA and its implementing regulations were clearly authorized by Congress. As the Supreme Court explained in *Blan-*

*chette v. Connecticut General Insurance Corps.*, 419 U.S. 102, 127 n. 16, 95 S.Ct. 335, 350 n. 16, 42 L.Ed.2d 320 (1974) (citations omitted), " 'The taking of private property by an officer of the United States for public use, without being authorized, expressly or by necessary implication, to do so by some act of Congress, is not the act of the government,' and hence recovery is not available in the Court of Claims." The takings cases relied upon by plaintiff involve actions undertaken without statutory authority and thus, are inapposite.

Therefore, at best, even if a court were to determine that the FIRREA abrogated the regulatory forbearance allegedly issued to plaintiff, and even if that abrogation effectuated a taking, the remedy to which plaintiff would be entitled is monetary relief. As the Court of Appeals for the Sixth Circuit found in a comparable case, "If [plaintiff] did have a contractual property interest, we believe that the evidence of congressional intent is strong enough to infer that Congress wanted to effect a taking. *In the event that this action were determined to be a taking, [plaintiff] would be entitled to compensation, not to equitable relief." Franklin Federal Savings Bank v. Director, Office of Thrift Supervision*, 927 F.2d 1332, 1341 (6th Cir. 1991) (emphasis added).

The only question that remains, therefore, is whether a Tucker Act remedy is available. The jurisdiction of the Claims Court is exclusive if the property alleged to have been taken exceeds $10,000. *See Monsanto*, 467 U.S. at 1020, 104 S.Ct. at 2881. The relief available to plaintiff, if it were to succeed, is considerably more than the $10,000 that is required for this Court to be able to exercise concurrent jurisdiction. Moreover, there is no indication that "Congress has in the [FIRREA] *withdrawn* the Tucker Act grant of jurisdiction to the [Claims Court] to hear a suit involving the [FIRREA] 'founded . . . upon the Constitution.'" *Preseault*, 110 S.Ct. at 922 (citations omitted) (emphasis in original). Congress did not exhibit the type of "unambiguous intention to withdraw the Tucker Act remedy." *Monsanto*, 467 U.S. at 1019, 104 S.Ct. at 2881.

Consequently, this case must be dismissed for lack of subject matter jurisdiction. If plaintiff wishes to litigate its claims, it must seek monetary relief in the United States Claims Court.[5]

## III. CONCLUSION

For the reasons expressed above, it is hereby

ORDERED that defendants' motion to dismiss. is granted; it is

FURTHER ORDERED that this case is dismissed without prejudice to renew in the United States Claims Court; it is

FURTHER ORDERED that plaintiff's motion for summary judgment is denied as moot; it is

FURTHER ORDERED that plaintiff's motion for a preliminary injunction is denied as moot.

IT IS SO ORDERED.

---

**5.** *See Olympic Federal Savings and Loan Association v. Director, Office of Thrift Supervision,* No. 90–0482, slip op. at 14–22, 1990 WL 134841 (D.D.C. Sept. 6, 1990).