**SECURITY SAVINGS BANK, SLA, Plaintiff,**

v.

**DIRECTOR, OFFICE OF THRIFT SUPERVISION, et al., Defendants.**

**Civ. A. No. 91–2551.**

United States District Court, D. New Jersey.

July 28, 1992.

---

Charles J. Cooper, Shaw, Pittman, Potts & Trowbridge, Washington, D.C., Michael J. Gruccio, Milstead, Gruccio & DiDomenico, Vineland, N.J., for plaintiff.

Carole A. Jeandheur, U.S. Dept. of Justice, Civ. Div., Washington, D.C., for defendant, F.D.I.C.

Geraldine R. Gennet, Office of Chief Counsel, Office of Thrift Supervision, Washington, D.C., for defendant, Office of Thrift Supervision.

## OPINION

GERRY, Chief Judge.

This is a case born out of the infamous savings and loan crisis and the legislation passed by Congress in the late 1980's in an attempt to avert it. The plaintiff is Security Savings Bank ("Security"), a relatively successful New Jersey savings and loan institution, which is suing the Office of Thrift Supervision ("OTS"), the federal regulatory agency charged with regulation of the savings and loan industry, and the Federal Deposit Insurance Corporation ("FDIC"), the agency responsible for insuring the accounts of depositors in thrift institutions, on what is essentially a breach of contract claim. Security claims that it entered into an agreement with federal regulators[1] in the early 1980's by which it agreed to take over two failing thrift institutions in exchange for which the government agreed to relax certain regulatory requirements regarding the amount of capital Security was required to maintain over the next 10–15 years. In 1989, Congress passed the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), which, among other things, strengthened the regulatory capital standards for the thrift industry, effectively increasing the levels of capital that thrifts were required to maintain and specifically prohibiting the loophole through which Security had been granted more lenient treatment in the early 1980's. Claiming that their agreement with the federal government in the early 1980's was a binding contract, Security is now challenging the imposition of these new capital requirements as a breach of contract, and an unconstitutional taking under the fifth amendment.[2] Defendants have moved to dismiss both for lack of subject matter jurisdiction and on the merits of plaintiff's claims, and plaintiff has cross-moved for summary judgment. Because we find that this court lacks subject matter jurisdiction over any of plaintiff's claims, defendants' motion to dismiss will be granted and plaintiff's motion for summary judgment will be denied.

## I. FACTUAL BACKGROUND

During the late 1970's and early 1980's, record high interest and inflation rates pushed the cost of retaining and obtaining depositors for savings and loan institutions substantially above the rate of return that such institutions were receiving on their portfolios of long-term, low-yielding fixed rate mortgages. This, in part, precipitated the much-publicized savings and loan crisis, which threatened to deplete the reserves of the Federal Savings and Loan Insurance Corporation ("FSLIC"). In an attempt to avoid wherever possible the expense of having to liquidate insolvent S & L's and pay insurance claims on the accounts, the FSLIC attempted to induce financially

---

1. These federal regulators were originally the Federal Home Loan Bank Board ("FHLBB") and the Federal Savings and Loan Insurance Corporation ("FSLIC"), whose powers and responsibilities were transferred by Congress in 1989 to the newly created Office of Thrift Supervision ("OTS") and the Federal Deposit Insurance Corporation ("FDIC"), respectively.

2. *See infra* note 6.

sound institutions to merge with troubled thrifts, and thus save them from insolvency. In order to induce the healthy thrifts to enter into these mergers, the FSLIC promised cash contributions, as well as certain regulatory forbearances, which would essentially allow the thrifts to maintain levels of capital substantially lower than those required by law.

Federal regulations require savings and loan institutions to maintain levels of capital funds equal to a certain percentage of their total liabilities. In order to allow institutions that acquired ailing thrifts to avoid these minimum capital requirements, the FSLIC authorized the use of an accounting method (the "purchase method") which essentially creates fictional capital, called "supervisory goodwill," which is used to make the thrifts' financial records appear as if regulatory capital requirements are being met. "Supervisory goodwill" is a fictitious dollar amount equal to the amount by which the acquired (failing) institution's liabilities exceed its assets. Paradoxically, this means that the weaker the acquired institution, the more supervisory goodwill it creates. This supervisory goodwill can then be recorded as a capital asset by the healthy, acquiring institution in order to meet regulatory minimum capital requirements, and it may be amortized on a straight-line basis over a period of up to 40 years.[3]

In this case, Security claims that the FSLIC made just such an agreement regarding supervisory goodwill in order to induce it to acquire two failing thrifts in 1982: First Federal Savings and Loan of Burlington County, New Jersey ("Burlington"), and Princeton Savings and Loan Association ("Princeton"). Security agreed to acquire the ailing thrifts, thus saving the government millions of dollars in liquidation and insurance costs, in return for the government's promise to allow Security to amortize supervisory goodwill over a period of 30 years. Security claims that this provision was essential to their participation in the agreement, and that "had

Security not been permitted to record the supervisory goodwill as an amortizing asset included in regulatory capital, Security's acquisition of Burlington and Princeton ... would have decimated Security's regulatory net worth, crippled its prospective financial performance, and destroyed its reputation as a financially sound institution."[4] As evidence of this agreement, Security points to a number of documents executed around the time of the mergers, including an Assistance Agreement between the FSLIC and Security, several forbearance letters issued by the Federal Home Loan Bank Board ("FHLBB"), and an FHLBB Resolution. Security contends that when viewed as a whole, these documents establish the existence of a binding contract between the parties.

Congress enacted FIRREA in 1989 in response to the savings and loan crisis. In addition to providing billions of dollars in funds to close insolvent institutions and recapitalize the federal insurance fund, the Act set new stricter standards for the minimum capital requirements to be imposed on thrifts, and required the OTS—the successor to the FHLBB—to promulgate new regulations implementing these standards. Under the new regulations, which went into effect on December 7, 1989, *see* 54 Fed.Reg. 46861, the amount of "supervisory goodwill" that may be used to meet minimum capital levels is severely restricted.

Initially, the OTS granted Security an exemption from these regulations based on a Capital Plan submitted by Security according to which it planned to meet all requirements by the end of 1994. Security, however, was unable to meet the targets set out in its Capital Plan, and by January, 1991, the OTS began imposing various restrictions on Security, including, *inter alia*, 1) prohibiting Security from making, investing in, purchasing, or refinancing certain types of commercial loans without prior written non-objection from the OTS; 2) prohibiting Security from releasing any

---

**3.** This seemingly bizarre accounting practice was apparently consistent with the Generally Accepted Accounting Principles at the time.

**4.** Complaint at ¶ 46.

borrower from personal liability without prior written non-objection from the OTS; 3) prohibiting capital distributions; and 4) limiting the compensation of directors, executive officers and other employees. The OTS is now also requiring Security to adhere to a revised capital plan and threatens to take further restrictive action if Security violates that plan.

Security alleges that these restrictions imposed by the OTS have forced it to reduce its size and have prevented it from taking advantage of opportunities that would enable it to increase earnings and capital through growth. Security alleges that imposition of new capital requirements pursuant to FIRREA constitutes a breach of its original contract and an unconstitutional taking. Security is seeking declaratory and injunctive relief as well as costs and attorneys' fees.

## II. JURISDICTION

As with any action brought before the court, our first task must be to determine whether subject matter jurisdiction is proper in this court. It is well established that a federal court may not exercise jurisdiction over a claim against the United States unless there exists by federal statute both an affirmative grant of subject matter jurisdiction as well as an express waiver of sovereign immunity. According to defendants, there is only one statute that provides such a grant of jurisdiction and waiver of immunity with respect to the type of claims against the United States that plaintiff brings here, and that is the Tucker Act. Since the Tucker Act only provides for jurisdiction over such claims in the United States Claims Court, they argue that this court lacks jurisdiction over plaintiff's claims.

The Tucker Act reads as follows:

The United States Claims Court shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States.

28 U.S.C. § 1491. The Act also provides that such jurisdiction is concurrent with that of the district courts for claims not exceeding $10,000.[5] The Supreme Court has held that this language operates both as a waiver of sovereign immunity and a grant of jurisdiction to the Claims Court. *See United States v. Mitchell*, 463 U.S. 206, 216, 103 S.Ct. 2961, 2967, 77 L.Ed.2d 580 (1983).

■ It is often said that for Tucker Act claims seeking damages of more than $10,000 against the United States, the Claims Court's jurisdiction is exclusive. *See Bowen v. Massachusetts*, 487 U.S. 879, 910 n. 48, 108 S.Ct. 2722, 2740 n. 48, 101 L.Ed.2d 749 (1988). There is some dispute, however, as to whether this is so because the Tucker Act itself affirmatively forbids any concurrent jurisdiction over such claims, *see, e.g., Sharp v. Weinberger*, 798 F.2d 1521, 1524 (D.C.Cir.1986), or because in most instances there simply is no other statute that provides the requisite waiver of sovereign immunity. *See, e.g., Hahn v. U.S.*, 757 F.2d 581, 586 (3d Cir.1985). To the extent that the Claims Court's jurisdiction under the Tucker Act is exclusive in the first sense, injunctive relief against the government is simply not available, since the Tucker Act provides for relief only in the form of damages.

Plaintiff's contract and constitutional claims present analytically distinct problems with respect to the impact of the Tucker Act on this court's jurisdiction, and we therefore address them separately. We will begin with the Fifth Amendment takings claim[6] because the Third Circuit has

---

**5.** This provision is referred to as the "Little Tucker Act."

**6.** Although plaintiff also states in its complaint that defendants' actions violated its due process rights, plaintiff's arguments in support of both constitutional claims have centered around takings clause precedent only. When asked at oral argument whether plaintiff was asserting a due process claim separate from its takings claim, counsel for plaintiff responded that the two claims were "separate but indistinguishable." Because plaintiff has failed to offer a doctrinal basis for its due process claim that effectively distinguishes it from the takings claim, we con-

recently provided us with some much needed guidance on this issue in *Carteret Savings Bank v. OTS*, 963 F.2d 567 (3d Cir. 1992).

### A. *Takings Claim*

 The takings clause does not prohibit the taking of private property per se, but rather requires that if such a taking occurs, just compensation be paid. Such compensation need not be paid in advance or even contemporaneously with the taking. *See Preseault v. I.C.C.*, 494 U.S. 1, 10, 110 S.Ct. 914, 921, 108 L.Ed.2d 1 (1990). Therefore, "[e]quitable relief is not available to enjoin an alleged taking of private property for a public use, duly authorized by law when a suit for compensation can be brought against the sovereign subsequent to the taking." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1016, 104 S.Ct. 2862, 2880, 81 L.Ed.2d 815 (1984).

 Since such a suit for compensation can generally be brought in the Claims Court under the Tucker Act, a suit such as this one for equitable relief in a district court is accordingly not available. *See id.; Flagship Federal Savings Bank v. Wall*, 748 F.Supp. 742, 746–47 (S.D.Cal.1990). The Tucker Act's jurisdiction over takings claims is thus made exclusive by the nature of the constitutional guarantee itself. Where just compensation is available, a taking is not unconstitutional; the availability of just compensation under the Tucker Act in the Claims Court therefore vitiates the need for any other relief in any other court.

Plaintiffs argue that a suit for damages under the Tucker Act will not yield the "just compensation" required under the Fifth Amendment in this case because the potential loss to Security resulting from the imposition of FIRREA's new capital requirements cannot be quantified in monetary terms. In *Carteret*, however, the

Third Circuit rejected the same argument in the context of facts virtually identical to those presented here. That case was also brought by a savings and loan institution that had acquired two failing thrifts in the early 1980's under an agreement with federal regulators allowing them to count supervisory goodwill as capital and to amortize it over a lengthy period. Like the plaintiff in this suit, Carteret Savings Bank sought an injunction preventing the OTS and the FDIC from enforcing the new capital standards promulgated under FIRREA on the grounds that it was a breach of contract and an unconstitutional taking.

While agreeing in principle with the proposition that "where compensation under the Tucker Act is unavailable or inadequate, the plaintiff is entitled to equitable relief even in a United States District Court," *Carteret*, 963 F.2d at 582 (quoting district court opinion, 762 F.Supp. 1159, 1179 (D.N.J.1991)), the Third Circuit held that this was not such a case. On the facts before it, the court held that the Claims Court remedy was sufficient despite the difficulties in measuring the damage to the thrift's business caused by the sanctions imposed by the OTS, and that jurisdiction in the district court for injunctive relief was therefore lacking. *See id.* 963 F.2d at 584. In support of its holding, the court cited a Supreme Court case, *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 155–56, 95 S.Ct. 335, 364–65, 42 L.Ed.2d 320 (1974), for the proposition that "takings resulting in significant losses of business, *including the closing down of a business*, are not beyond the power of the Claims Court to compensate." *Carteret*, 963 F.2d at 584 (emphasis added). Because we do not find any factual differences between the instant case and *Carteret* significant enough to warrant a different holding here,[7] we hold that this court lacks jurisdic-

strue the complaint to state a single constitutional claim under the takings clause.

**7.** We are not convinced by plaintiff's desperate yet creative attempt to distinguish *Carteret*. Plaintiff points to the fact that at the time of the circuit court's opinion in *Carteret*, Carteret Savings Bank's financial condition had already de-

teriorated to the point that even if the district court's injunction had been upheld and the bank allowed to count all supervisory goodwill as capital, it would still have been unable to meet FIRREA's capital requirements and thus would still have been subject to intervention and sanctions by the OTS. *See Carteret*, 963 F.2d at 572.

tion over plaintiff's takings claim because the United States Claims Court has exclusive jurisdiction over that claim pursuant to the Tucker Act.

### B. Contract Claims

With respect to plaintiff's contract claims, defendants also assert that the jurisdiction of the Claims Court pursuant to the Tucker Act is exclusive. Plaintiff attempts to rest jurisdiction in this court on two alternate grounds: first, on FIRREA itself, which states that the OTS is "subject to suit," 12 U.S.C. § 1464(d)(1)(A), and that the FDIC has the power "[t]o sue and be sued," 12 U.S.C. § 1819(a); and second, on the Administrative Procedures Act ("APA") in conjunction with the federal question jurisdiction statute, 28 U.S.C. § 1331.

### 1. Jurisdiction under FIRREA

■ FIRREA provides that "the Director [of the OTS] shall be subject to suit (other than suits on claims for money damages) by any Federal savings association ... in the United States district court for the judicial district in which the savings association's home office is located," 12 U.S.C. § 1464(d)(1)(A), and that the FDIC has the power "[t]o sue and be sued ... in any court of law or equity, State or Federal." 12 U.S.C. § 1819(a). A number of district courts confronted by suits almost identical to this one, brought by thrift institutions seeking to enjoin the enforcement of the OTS's new capital requirements with

respect to supervisory goodwill, have held that these provisions in FIRREA do provide an adequate basis for jurisdiction. *See Carteret Savings Bank v. OTS*, 762 F.Supp. 1159, 1167 (D.N.J.1991), *reversed on other grounds*, 963 F.2d 567 (3d Cir. 1992); *Security Federal Savings & Loan Ass'n v. FSLIC*, 796 F.Supp. 1435 (D.N.M. 1991); *Guaranty Financial Services, Inc. v. OTS*, 742 F.Supp. 1159 (M.D.Ga.1990), *rev'd on other grounds*, 928 F.2d 994 (11th Cir.1991); *Flagship Federal Savings Bank v. M. Danny Wall, Director*, Civ. No. 90-0079 (S.D.Cal. Feb. 14, 1990). The District Court of the District Columbia has provided the lone voice of dissent on this issue, consistently taking the opposite view in a string of factually similar cases. *See Coast Federal Savings Bank v. OTS*, 785 F.Supp. 170 (D.D.C.1991); *Northeast Savings v. OTS*, 770 F.Supp. 19 (D.D.C.1991); *Olympic Federal Savings and Loan Association v. OTS*, No. 90-0482, slip op., 1990 WL 134841 (D.D.C. Sept. 6, 1990). Although the weight of the precedent clearly points in the opposite direction, we find the District of Columbia court's analysis to be far more persuasive on this issue, and accordingly follow that court's view that FIRREA does not provide an adequate basis for jurisdiction over the type of claim presented here.

First we note that while interpretation of these particular clauses in FIRREA authorizing suit against the OTS and the FDIC is fairly new, there is a substantial body of

---

Here, in contrast, an injunction would make the difference between Security being in full compliance with FIRREA's requirements and being out of compliance. Therefore, plaintiff argues, in *Carteret* the loss of supervisory goodwill could be measured in damages like any other asset, while, for Security, damages would be more difficult to measure because the injunction might very well mean the difference between staying in business and going out of business.

First, as noted above, the *Carteret* opinion clearly indicates that even "the closing down of a business [is] not beyond the power of the Claims Court to compensate." *Carteret*, 963 F.2d at 584 (*citing Regional Rail Reorganization Act Cases*, 419 U.S. 102, 155–56, 95 S.Ct. 335, 364–65, 42 L.Ed.2d 320 (1974)). Second, the fact that the plaintiff in *Carteret* had no hope of

ever fully complying with FIRREA's requirements does not mean that an injunction in that case could not have at least lessened the amount of intervention by the OTS to a sufficient degree to make the difference necessary to keep the business afloat. Finally, Carteret's financial position at the time of the district court's order in that case was apparently quite similar to Security's, and the fact that its condition had worsened by the time the appeal was heard was only noted by the circuit court in the context of discussing mootness. *See Carteret*, 963 F.2d at 572. There is absolutely no indication that the Third Circuit took these new facts into consideration in the context of its takings holding. Thus, the possibility that the injunction at issue could mean the difference between plaintiff staying in business or going out of business appears to have been as much a consideration to the Third Circuit in *Carteret* as it is here.

established case law interpreting similar statutory authorizations for the Secretary of Housing and Urban Development to "sue and be sued." *See* 12 U.S.C. § 1702 and 42 U.S.C. § 1404a. These clauses have been consistently interpreted by the courts to waive sovereign immunity as to suits against the agency itself, but not as to suits against the United States. *See, e.g., Federal Housing Administration v. Burr*, 309 U.S. 242, 250, 60 S.Ct. 488, 492, 84 L.Ed. 724 (1940); *Weeks Construction Inc. v. Oglala Sioux Housing Authority*, 797 F.2d 668, 675 (8th Cir.1986); *Falls Riverway Realty v. Niagara Falls*, 754 F.2d 49, 55 (2d Cir.1985); *Taylor v. Administrator of Small Business Admin.*, 722 F.2d 105, 108 (5th Cir.1983); *Marcus Garvey Square v. Winston Burnett Construction Co.*, 595 F.2d 1126 (9th Cir.1979); *Carlyle Gardens Co. v. Delaware State Housing Authority*, 659 F.Supp. 1300, 1304 (D.Del.1987). We can see no reason why the provisions of FIRREA at issue here should not be interpreted in accordance with this precedent.

■ In order to determine whether a suit is against a federal agency or against the sovereign itself, we cannot simply rely on the caption of the complaint, but must instead refer to the standards set forth by the Supreme Court in *Dugan v. Rank*, 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963). *See Marcus Garvey*, 595 F.2d at 1131. In *Dugan* the court held that:

> The general rule is that a suit is against the sovereign if "the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration" ... or if the effect of the judgment would be "to restrain the Government from acting, or compel it to act."

*Id.* 372 U.S. at 620, 83 S.Ct. at 1006 (*quoting Land v. Dollar*, 330 U.S. 731, 738, 67 S.Ct. 1009, 1012, 91 L.Ed. 1209 (1947) and *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 704, 69 S.Ct. 1457, 1468, 93 L.Ed. 1628 (1949)). Thus, sovereign immunity does not only apply to suits for damages. Indeed the Court has emphasized the particularly important function that sovereign immunity serves in limiting the ability to obtain injunctive relief against the government.

> [I]t is one thing to provide a method by which a citizen may be compensated for a wrong done to him by the Government. It is a far different matter to permit a court to exercise its compulsive powers to restrain the Government from acting, or to compel it to act. There are the strongest reasons of public policy for the rule that such relief cannot be had against the sovereign. The Government, as representative of the community as a whole, cannot be stopped in its tracks by any plaintiff who presents a disputed question of property or contract right.

*Larson*, 337 U.S. at 704, 69 S.Ct. at 1468.

*Dugan* was a suit brought by water-right claimants along the San Joaquin River seeking an injunction preventing officials of the United States Bureau of Reclamation from diverting water from the river as part of a congressionally authorized dam construction project. The Supreme Court held that this suit was against the United States, noting that issuance of the injunction would force the abandonment of a substantial portion of a "project which has not only been fully authorized by the Congress but paid for through its continuing appropriations." 372 U.S. at 621, 83 S.Ct. at 1006–07. In *Larson*, the plaintiff brought a contract claim against a federal official, the head of the War Assets Administration, seeking an injunction prohibiting the official from selling or delivering to any one else certain coal to which plaintiff claimed to be contractually entitled. The Supreme Court held that the claim was in reality against the United States and therefore barred by sovereign immunity. *See* 337 U.S. at 689, 69 S.Ct. at 1461. *See also Delaware Valley Conservation Assoc. v. Resor*, 392 F.2d 331 (3d Cir.1968) (suit seeking injunction against federal officials preventing them from carrying out a dam project on the Delaware River constituted a suit against the United States and was therefore barred by sovereign immunity).

■ There are, of course, limits to this rule. Sovereign immunity will not bar injunctive relief against the sovereign for

actions by government officials that are either beyond their statutory powers or beyond their constitutional powers. *See Dugan*, 372 U.S. at 621–22, 83 S.Ct. at 1006–07. Neither of these exceptions apply here, however. The complained-of actions taken by the defendant agencies in this case were squarely within their statutory authority under FIRREA, and indeed required by that statute. *See Carteret*, 963 F.2d at 582 (holding that Congress intended FIRREA to abrogate prior agreements between federal regulators and thrift institutions regarding the use of supervisory goodwill). Moreover, even though plaintiff here does make a claim that defendants' actions were unconstitutional under the takings clause, as we noted above, plaintiff is free to seek compensation from the Claims Court for any taking that has occurred, and therefore cannot at this stage show that any such taking actually violated the Fifth Amendment's prohibition against takings without just compensation. Because the injunctive relief sought here would operate to restrain the government from carrying out a congressional mandate, this suit is one against the sovereign itself.[8]

An argument can be made that the clause in FIRREA authorizing suit against the OTS should not be interpreted consistently with the precedent noted above regarding statutory provisions waiving sovereign immunity for suits against the Secretary of Housing and Urban Development, both because the OTS provision is worded differently—stating that the agency is "subject to suit" rather than that it has the power to "sue and be sued"—and because it explicitly limits its scope to suits "other

than ... for money damages." 12 U.S.C. § 1464(d)(1)(A). If suits for injunctive relief are construed as suits against the sovereign under *Larson* and *Dugan* and therefore not subject to this waiver, then—the argument goes—the statutory waiver appears to be drained of all meaning, since it can apply neither to damage actions nor to injunctive actions.

There are two responses which we think adequately resolve this objection. First, as Judge Lamberth of the District of Columbia pointed out in *Olympic*, the Supreme Court has made clear in *Bowen v. Massachusetts*, 487 U.S. 879, 893–96, 108 S.Ct. 2722, 2731–33, 101 L.Ed.2d 749 (1988), that actions for monetary relief do not always fall within the category of actions for money *damages*. *See Olympic*, slip op. at 12. Therefore there may be actions seeking monetary awards other than money damages which would be paid by funds within the exclusive possession and control of the agency, rather than from the public treasury. Such actions would not be against the sovereign under *Dugan*, and so would fall within the waiver. Additionally, a suit seeking injunctive relief against the OTS might constitute a suit against the agency rather than the sovereign, where the challenged action actually originated and was authorized within the agency itself—rather than, as here, having been directly authorized, and, indeed, demanded by congressional statute. Such a suit would also fall within the waiver.

Accordingly, we hold that the "subject to suit" and "sue and be sued" clauses in FIRREA do not operate to waive sovereign immunity with respect to plaintiff's claims, because those claims are in reality against

---

8. We agree with Judge Revercomb's conclusion in *Coast Federal Savings Bank v. OTS*, 785 F.Supp. 170 (D.D.C.1991), that the opinion of the Federal Circuit in *Far West Federal Bank v. OTS*, 930 F.2d 883 (Fed.Cir.1991), finding jurisdiction in the district court of Oregon to be proper under FIRREA, is distinguishable from a case such as this one, seeking injunctive relief. In *Far West*, the Federal Circuit considered only that count of plaintiff's complaint seeking contract rescission and restitution with respect to its alleged contract with federal regulators regarding the use of supervisory goodwill. *See id.* at 887. Thus, the injunctive aspect of that

claim, contract rescission, would not operate to prevent the OTS from carrying out its congressionally authorized obligations under FIRREA, and the monetary award sought—restitution—would be paid by funds under the exclusive possession and control of the agency, rather than "expending itself on the public treasury." *Dugan*, 372 U.S. at 620, 83 S.Ct. at 1006. Accordingly, the claim ruled on by the Federal Circuit in *Far West* was in fact against the agency rather than the sovereign, and the court's holding that the "subject to suit" clause waived immunity with respect to such a claim was entirely consistent with our holding here.

the sovereign itself rather than the agencies named. Therefore, FIRREA does not provide an adequate basis for jurisdiction in this court.

### 2. Jurisdiction under the APA

■ We turn now to consideration of the second basis for jurisdiction asserted by plaintiffs: 28 U.S.C. § 1331 in conjunction with the APA.[9] In 1976, the Administrative Procedures Act was amended specifically to provide for a waiver of sovereign immunity in suits brought against the United States seeking relief "other than money damages." The statute now provides:

> A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States *seeking relief other than money damages* and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.

5 U.S.C. § 702 (emphasis added).

■ It is well established that the APA does not provide an independent grant of subject matter jurisdiction to the federal courts. *See Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). However, plaintiff's contract claims fall within this court's federal question jurisdiction, 28 U.S.C. § 1331, since the federal common law of contracts applies to contracts with the federal government. *See Falls Riverway Realty v. Niagra Falls*, 754 F.2d 49, 55 n. 4 (2d Cir.1985); *North*

*Side Lumber Co. v. Block*, 753 F.2d 1482, 1484 (9th Cir.), *cert. denied*, 474 U.S. 931, 106 S.Ct. 265, 88 L.Ed.2d 271 (1985); *Montana Power Co. v. U.S.*, 8 Cl.Ct. 730 (1985). The difficult issue that plaintiff faces in attempting to ground jurisdiction on the APA and § 1331 is showing that sovereign immunity has effectively been waived.

Section 702 of the APA generally operates to waive sovereign immunity in suits seeking relief "other than money damages," but this language is then followed by two exceptions which defendants claim are both applicable in this instance. First, § 702 goes on to state:

> Nothing herein ... confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

Secondly, § 704 adds a further exception, stating:

> Agency action made reviewable by statute and final agency action *for which there is no other adequate remedy in a court* are subject to judicial review.

(Emphasis added.)

Defendants argue that the Tucker Act both provides an adequate remedy in a court and impliedly forbids the relief sought here, and therefore renders the APA's waiver of sovereign immunity inapplicable under either or both exceptions. Plaintiff argues that the relief available under the Tucker Act—damages—is not adequate in this case where injunctive relief is sought; and that, while the Claims Court's jurisdiction over contract claims against the United States for *damages* of over $10,000 may be exclusive, that Act does not operate to "forbid" the district courts from hearing contract claims seeking *equitable* relief against the United

---

**9.** Most district courts that have heard cases similar to this one have not addressed the adequacy of this jurisdictional basis because they have found jurisdiction to be proper under FIRREA. Two cases from this district cited the APA as a valid basis for jurisdiction, but in one case the defendants had apparently conceded the point, *see Hansen Savings Bank v. OTS*, 758 F.Supp. 240, 244 (D.N.J.1991); and in the other, the court simply made a conclusory statement to that effect without offering any analysis. *See Carteret Savings Bank v. OTS*, 762 F.Supp. 1159,

1166 (D.N.J.1991), *rev'd on other grounds*, 963 F.2d 567 (3d Cir.1992). Here again, we follow the District Court of the District of Columbia, which has consistently held that the APA in conjunction with 28 U.S.C. § 1331 does not provide an adequate basis for jurisdiction over such claims in a district court. *See Coast Federal Savings Bank v. OTS*, 785 F.Supp. 170 (D.D.C. 1991); *Northeast Savings v. OTS*, 770 F.Supp. 19 (D.D.C.1991); *Olympic Federal Savings and Loan Association v. OTS*, No. 90–482, slip op., 1990 WL 134841 (D.D.C. Sept. 6, 1990).

States where an appropriate grant of jurisdiction and waiver of immunity can be found outside the Tucker Act.

Our earlier holding that the Tucker Act remedy is adequate to redress plaintiff's takings claim may at first blush appear to necessitate a parallel holding with respect to the § 704 exception: that the Tucker Act remedy is adequate and the exception therefore applicable. We note, however, that the analysis here differs somewhat from that under the takings clause. The constitutional prohibition against government takings "without just compensation" itself contains a built-in assumption that damages are an adequate remedy for a taking. It does not necessarily follow that damages provide an adequate remedy for a contract breach. Because we hold that the other exception to the APA's waiver of sovereign immunity applies here, however, we need not reach this issue directly.

■ As we noted above, it is not entirely clear whether the Tucker Act's grant of jurisdiction to the Claims Court actually operates to affirmatively "forbid" other relief in other forums, or whether it grants exclusive jurisdiction to the Claims Court only to the extent that no other statute usually provides the necessary grant of jurisdiction and waiver of immunity to allow such suits to be brought in other courts. An examination of the case law indicates that the Tucker Act operates differently with respect to contract claims than it does with respect to claims founded upon the Constitution, statutes or regulations, even though there is no indication in the language of the statute that these claims should be treated differently. Thus, with the exception of takings claims,[10] the Tucker Act does not operate to affirmatively forbid injunctive relief in district courts on constitutional, statutory and regulatory claims that fall within the ambit of the Tucker Act.[11] Therefore, to the extent that a statutory grant of jurisdiction and waiver of immunity can be found elsewhere (such as in the APA and 28 U.S.C. § 1331), such claims can be brought in district courts.[12] *See Bowen,* 487 U.S. at 910 n. 48, 108 S.Ct. at 2740 n. 48; *Hahn v. United States,* 757 F.2d 581, 586 (3d Cir.1985).

With respect to contract claims against the United States, on the other hand, there is case law that holds not only that the Tucker Act's jurisdiction over claims for damages is exclusive, but that the Tucker Act impliedly forbids any relief other than money damages on a contract claim, either in the Claims Court or any other court. Under that interpretation, jurisdiction cannot be based on the APA for any contract claim against the United States, since the Tucker Act "impliedly forbids" any relief "other than money damages" on such a claim. *See, e.g., Sharp v. Weinberger,* 798 F.2d 1521, 1524 (D.C.Cir.1986) (Scalia, J.) ("The sole remedy for an alleged breach of contract by the federal government is a claim for money damages ... under the Tucker Act"—therefore the APA "does not run to actions seeking declaratory relief or specific performance in contract cases, because that waiver is by its terms inapplicable" since the Tucker Act impliedly "forbids the relief which is sought"); *North Side Lumber,* 753 F.2d at 1485 ("the Tucker Act 'impliedly forbids' declaratory and injunctive relief and precludes a § 702 waiver of sovereign immunity in suits on government contracts"); C. Wright, A. Miller, and E. Cooper, *Federal Practice*

10. *See supra,* section IIA. As our discussion above indicated, the prohibition on injunctive relief for takings claims arises from the language of the constitutional provision itself rather than from the Tucker Act.

11. Not all claims against the United States invoking the Constitution, a statute, or a regulation are cognizable under the Tucker Act. The Act's jurisdiction can only be invoked with respect to such claims where the source of substantive law can "fairly be interpreted as mandating compensation by the Federal Government for the damage sustained." *United States v. Mitchell,* 463 U.S. at 218, 103 S.Ct. at 2968.

12. Indeed, the Tenth Circuit has held not only that the Tucker Act does not "forbid" equitable relief on such claims, but that the Act's exclusive jurisdiction is not even triggered unless the "essential purpose of the complaining party is to obtain money from the government." *New Mexico v. Regan,* 745 F.2d 1318, 1322 (10th Cir.1984), *cert. denied,* 471 U.S. 1065, 105 S.Ct. 2138, 85 L.Ed.2d 496 (1985).

*and Procedure* § 3659 at 359 (1985) (stating, in context of discussing § 702 of the APA, "the Tucker Act ... forbids by implication relief other than that specifically provided by the Act"); *see also Sea–Land Service, Inc. v. Brown,* 600 F.2d 429, 433 (3d Cir.1979) ("Since plaintiffs could not get specific performance on a government contract prior to the [1976] amendments [to the APA] ... it follows that they are not entitled to similar relief now in the district courts by virtue of the APA amendments").

This interpretation of the Tucker Act and its impact upon jurisdiction under the APA also finds support in the legislative history of the 1976 amendments to the APA. The House report reads:

> [T]he amendment to 5 U.S.C. section 702 is not intended to permit suit in circumstances where statutes forbid or limit the relief sought. Clause (2) of the third new sentence added to section 702 contains a second proviso concerned with situations in which Congress has consented to suit and the remedy provided is intended to be the exclusive remedy. For example, in the [Tucker Act], Congress created a damage remedy for contract claims with jurisdiction limited to the Court of Claims except in suits for less than $10,000. *The measure is intended to foreclose specific performance of government contracts.* In the terms of the proviso, a statute granting consent to suit, i.e., the Tucker Act, "impliedly forbids" relief other than the remedy provided by the Act. Thus, the partial abolition of sovereign immunity brought about by this bill does not change existing limitations on specific relief, if any, derived from statutes dealing with such matters as government contracts....

H.R.Rep. No. 94–1656, 94th Congress, 2nd Session at 12–13, *reprinted in* 1976 U.S.Code Cong. & Admin.News 6121, 6133 (emphasis added).

Plaintiff argues that a recent Supreme Court case, *Bowen v. Massachusetts,* 487 U.S. 879, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988), overruled this line of precedent. In *Bowen,* the state of Massachusetts sought declaratory and injunctive relief compelling the Secretary of Health and Human Services to pay the state for expenditures that were allegedly reimbursable under the Medicaid program. The government argued that pursuant to § 704, the APA's waiver of sovereign immunity was not applicable to plaintiff's claims because another "adequate remedy" was available: an action for damages in the Claims Court under the Tucker Act. The Court rejected this argument, because, "[t]he Claims Court does not have the general equitable powers of a district court to grant prospective relief." *Id.* at 905, 108 S.Ct. at 2737. Because the Court found that the monetary relief sought by Massachusetts was not equivalent to money damages and, moreover, that the entry of injunctive or declaratory relief might turn out to be an appropriate remedy in the case, it held that the availability of relief under the Tucker Act did not in this instance preclude application of the APA's waiver of sovereign immunity.

Unfortunately for plaintiff, *Bowen*'s holding is clearly not on point here because it involved a statutory claim rather than a contract claim. It was clear before *Bowen* that the Tucker Act would not bar statutory claims for equitable relief. What *Bowen* did was to redraw the definition of equitable relief in such circumstances to include certain claims for monetary relief. But for plaintiff in this action, it is not the line between equitable relief and damages that is troubling; rather, it is the distinction between statutory/constitutional claims and contract claims. *Bowen* did nothing to address that distinction directly. Moreover, *Bowen* made no mention of the language in § 702 so troubling to plaintiff here: rendering the APA's waiver of sovereign immunity inapplicable where another statute "impliedly forbids the relief sought." [13] Indeed, a number of post-*Bowen* circuit court opinions have noted *Bowen*'s inapplicability to contract actions and

---

**13.** Since the Tucker Act does not operate to "forbid" equitable relief for statutory claims (as it may do for contract claims), it makes sense that this exception was not discussed in *Bowen.*

have continued to apply the *Sharp* line of authority that holds that the Tucker Act forbids injunctive relief on contract claims against the United States. *See Wabash Valley Power Assoc. v. Rural Electrification Admin.*, 903 F.2d 445, 452 (7th Cir. 1990) ("Tucker Act assigns all actions seeking equitable relief based on a contract with the U.S. to the Claims Court"); *Eagle-Picher Industries, Inc. v. U.S.*, 901 F.2d 1530, 1532 (10th Cir.1990) ("the waiver of sovereign immunity in the APA does not extend to actions founded upon a contract with the United States, which are governed by the Tucker Act"). *Coggeshall Development Corp. v. Diamond*, 884 F.2d 1, 3 (1st Cir.1989) ("the only remedy to which the U.S. has consented in cases of breach of contract is payment of money damages in the Court of Claims if the amount is over $10,000").

We find the supposition that the Tucker Act treats contract actions differently from statutory and constitutional claims somewhat troubling because there is no indication in the language of the Act itself that such a distinction should be drawn, and the cases taking this position offer no explanation or rationale for the distinction. Nonetheless, the legislative history quoted above convinces us that when Congress included the § 702 exception to the APA's waiver of sovereign immunity for situations where another statute "impliedly forbids the relief sought" it was aware that the courts had interpreted the Tucker Act to impliedly forbid equitable relief on contract claims against the United States,[14] and that it was precisely that doctrine that Congress sought to preserve with the exception. Because we therefore find a clear congressional intent to exclude contract claims cognizable under the Tucker Act from the APA's waiver of sovereign immunity, we hold that the APA cannot form a jurisdictional basis for plaintiff's contract claims here.

## III. CONCLUSION

Accordingly, we hold that the Tucker Act provides the sole basis for jurisdiction over both plaintiff's takings claim and its contract claims. Because the Tucker Act waives sovereign immunity and grants jurisdiction over such claims to the Claims Court only, this court is without subject matter jurisdiction. Plaintiff's complaint must therefore be dismissed in its entirety.

---

**14.** *See International Engineering Co., Division of A-T-O, Inc. v. Richardson*, 512 F.2d 573, 580 (D.C.Cir.1975), *cert. denied*, 423 U.S. 1048, 96 S.Ct. 774, 46 L.Ed.2d 636 (1976); *Warner v. Cox*, 487 F.2d 1301, 1306 (5th Cir.1974).